499 A.2d 928

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Paul J. COCKRELL.

Misc. (Subtitle BV), No. 23, Sept. Term, 1984.

Court of Appeals of Maryland.

Nov. 6, 1985.

Melvin Hirshman, Bar Counsel and Glenn M. Grossman, Asst. Bar Counsel, Annapolis, for the Atty Grievance Com'n of Md.

Paul J. Cockrell, Baltimore, pro se.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ.

COUCH, Judge.

Acting pursuant to the provisions of Maryland Rule BV 9, Bar Counsel, on behalf of the Attorney Grievance Commission, filed a petition with us seeking disciplinary action against Paul J. Cockrell, a member of the Bar of this Court. The petition asserted that Cockrell violated Disciplinary Rules 1–102(A), (1), (4), (5), (6); [1] Disciplinary Rule 6–101 (A) (3); [2] Disciplinary Rule 7–101 (A), (1), (2), (3) [3] in his repre-

---

**1.** Canon 1 of the Code of Professional Responsibility states: "A Lawyer Should Assist in Maintaining the Integrity and Competence of the Legal Profession"; and Disciplinary Rule DR 1–102 provides as follows:

DR 1–102 Misconduct.
(A) A lawyer shall not:
    (1) Violate a Disciplinary Rule.
    (2) Circumvent a Disciplinary Rule through actions of another.
    (3) Engage in illegal conduct involving moral turpitude.
    (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
    (5) Engage in conduct that is prejudicial to the administration of justice.
    (6) Engage in any other conduct that adversely reflects on his fitness to practice law.

**2.** Canon 6 of the Code states: "A Lawyer Should Represent a Client Competently"; and Disciplinary Rule DR 6–101(A)(3) provides as follows:

DR 6–101 Failing to Act Competently.
(A) A lawyer shall not:
    \*    \*    \*    \*    \*    \*
    (3) Neglect a legal matter entrusted to him.

**3.** Canon 7 of the Code states: "A Lawyer Should Represent a Client Zealously Within the Bounds of the Law"; and Disciplinary Rule 7–101(A) provides as follows:

DR 7–101 Representing a Client Zealously.
(A) A lawyer shall not intentionally:
    (1) Fail to seek the lawful objectives of his client through reasonably available means permitted by law and the Disciplinary Rules, except as provided by DR 7–101(B). A lawyer does not violate this Disciplinary Rule, however, by acceding to reasonable requests of opposing counsel which do not prejudice the rights of his client, by being punctual in fulfilling all professional commitments, by avoiding offensive tactics, or by treating with courtesy and consideration all persons involved in the legal process.

sentation of Mozella Ziglar. The petition also asserted that Cockrell, in his representations of Alice Tanner, violated Disciplinary Rules 1–102 (A) (1), (5), (6); Disciplinary Rule 6–101 (A) (3); and Disciplinary Rules 7–101 (A) (1), (2), (3). It was further asserted that Cockrell violated Disciplinary Rules 1–102 (A) (1), (3), (4), (5), (6); Disciplinary Rules 9–102 (A) (1), (2)[4] in his representation of various clients between January 1, 1982 and May 29, 1984. Finally the petition alleged that Cockrell violated Maryland Code, Art. 10, sec. 44, relative to escrow funds.

Pursuant to Rule BV9 b, we referred the matter for hearing to a judge of the Third Judicial Circuit of Maryland. Following a hearing, the hearing judge made written findings of fact and conclusions of law in each of the three matters which, after reviewing the record, we adopt:

*"Findings of Fact: Ziglar Case*

"Pursuant to obtaining a decree of divorce, this Court by clear and convincing evidence finds Ms. Ziglar paid the

---

    (2) Fail to carry out a contract of employment entered into with a client for professional services, but he may withdraw as permitted under DR 2–110, DR 5–102, and DR 5–105.

    (3) Prejudice or damage his client during the course of the professional relationship, except as required under DR 7–102(B).

**4.** Canon 9 of the Code states: "A Lawyer Should Avoid Even the Appearance of Professional Impropriety"; and Disciplinary Rule DR 9–102(A) provides as follows:

    DR 9–102 Preserving Identity of Funds and Property of a Client.

    (A) All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:

    (1) Funds reasonably sufficient to pay bank charges may be deposited therein.

    (2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.

Respondent $260.00. A Bill of Complaint for a Divorce A Vinculo Matrimonii was drawn up but the decree was never finalized because of Respondent's failure to serve the husband, pursuant to then-Maryland Rule 530 which states in part:

> Rule 530. Dismissal for Lack of Jurisdiction or Prosecution...,
>
> C. For Lack of Prosecution—Exception.

An action is subject to dismissal for lack of prosecution at the expiration of one year from the last docket entry other than an entry made under this Rule, Rule 124, or Rule 125, except that an action for divorce a mensa et thoro and for permanent alimony is subject to dismissal under this section only after two years from the last docket entry.

In addition, we note that no effort was made by Respondent to serve by publication. Mr. Cockrell testified:

> Her husband was never located, and on the question of the Daily Record, after we had problems locating him I told her, I said 'We can run an order of publication, but that will take time....I told her the better way would be to try to locate her husband, and that's what happened to the case, Your Honor. (T. 39).

In mitigation, Mr. Cockrell argued that he was just serving the best interest of his client:

> ...If you can find your husband now, no problem, we can get it through earlier, but if I have to go through this procedure, it's got to run in the paper 3 weeks in a row to get it through, and the expense involved.... (T. 39).

Mr. Cockrell also argued that Ms. Ziglar's purpose in contacting the Grievance Commission was not to file a complaint:

> ...She was simply trying to locate me. If she had contacted me at that point, I would have gone ahead and proceeded with it. (T. 38).

Ms. Ziglar made repeated attempts to contact Respondent, but to no avail until the Attorney Grievance Commission intervened. At this point she was apprised that her case had been dismissed. She requested and received her $260.00 fee back from Mr. Cockrell.

*Conclusions of Law: Ziglar Case*

The Court finds by clear and convincing evidence that the Respondent violated the three disciplinary rules cited above [DR 1–102, DR 6–101, and DR 7–101] by his inattention to the case and by his failure to properly process the divorce action. He did not keep his client informed and did not respond to her reasonable requests for information. However, the Court does not find by clear and convincing evidence that Respondent engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation. [DR 1–102(A)(4)].

*Findings of Fact: Tanner Case*

This Court finds by clear and convincing evidence that Respondent was presented with a plethora of professional problems in regards to Alice Tanner. And as Mr. Cockrell testified, undoubtedly he was treating her as a 'whole person' and 'keeping her on this side of sanity' as far as her relationship with her husband was concerned. More specifically, however, he was asked to represent her when she was injured on August 26 and September 8, 1981 while riding an MTA bus (Court files, Petitioner's Exhibits 11, 12).

In the instant proceeding, William Edgar Carson, a Transit Casualty Company claims supervisor, testified as to the claim filed by Alice Tanner. Mr. Carson, in reading from his records, showed a letter of representation from Mr. Cockrell dated September 21, 1981. (Petitioner's Exhibit 9). Then his records reflected a series of phone calls made by the casualty company to Respondent which were never acknowledged. Finally, on January 20, 1983, Mr. Ed Brizendine, his supervisor, wrote a letter to

Mr. Cockrell informing him that a year and four months had passed and that the case would be closed if he was not advised to the contrary.

Dear Mr. Cockrell: It has been a year and four months since we have received your letter of representation in regard to this case. To date we have received no documentation of any description, despite numerous efforts to contact you and your office. If you are still interested in this case, please so advise and furnish documentation. If you are not interested please so advise, and we will close it. . . . (T. 101).

Mr. Carson testified that no response was obtained and the file was closed on May 18, 1983.

In response, Mr. Cockrell testified that he could not file a claim because, in turning the case over to his paralegals, he is not sure whether the medical report from Dr. Mitchell was received; and if received, was somewhere in the warehouse files:

Q. Mr. Cockrell, it is true, is it not that none of your files demonstrate any medical records on Mrs. Tanner?

A. To my knowledge I never got it (Dr. Mitchell's report). Certainly the records do not show, but that takes us back to the warehouse again. (T. 125, 126).

Mr. Cockrell further testified that there was no other medical evidence of the accident other than Dr. Mitchell's report. In support of his efforts to contact Dr. Mitchell, Respondent submitted a letter from his office requesting the report (Respondent's Exhibit 4). In support of his efforts to contact Ms. Tanner's employers, Respondent submitted a letter drafted by his paralegal, Miss Haines (Respondent's Exhibit 5). He then introduced a profile sheet on Ms. Tanner (Respondent's Exhibit 6) and a series of letters dated July 9, 1984 (Respondent's Exhibit 7), July 22, 1984 (Respondent's Exhibit 9), and September 12, 1984 (Respondent's Exhibit 10), informing Ms. Tanner that her case was still in the process of being settled.

Alice Tanner died on August 25, 1984 as a result of an automobile accident. (Petitioner's Exhibit 8).

As to bringing a claim on behalf of the estate, Mr. Cockrell testified that it was a personal injury claim and without her deposition to introduce into evidence, everything would be hearsay:

> ... I've had some unfortunate experiences in prior cases like this, where you go to a lot of time, trouble and expense and everything, where there's a missing ingredient ... it's a personal injury matter, and without her deposition ... and she's dead ... Everything that I have, practically, would be hearsay. (T. 124).

Therefore, when asked to respond to the Transit Casualty Company's interrogatories, 'he could not make out a case.'

*Conclusions of Law: Tanner Case*

This Court finds by clear and convincing evidence that Respondent violated the three disciplinary rules cited earlier [DR 1–102, DR 6–101, and DR 7–101] by his neglect of a legal matter entrusted to him, by his failure to respond to the Transit Casualty Company's request for documentation thereby causing the insurance claim to be dismissed, and by his failure to keep his client informed and to respond to her reasonable requests for information.

*The Allen Case*

The Respondent, by his acts or omissions in the Allen Complaint, was charged with violating the following Disciplinary Rules:

Disciplinary Rule 1–102

Misconduct.

(A) A lawyer shall not:

(1) Violate a Disciplinary Rule.

(3) Engage in illegal conduct involving moral turpitude.

    (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

    (5) Engage in conduct that is prejudicial to the administration of justice.

    (6) Engage in any other conduct that adversely reflects on his fitness to practice law.

Disciplinary Rule 9–102

Preserving Identity of Funds and Property of a Client.

(A) All funds of clients paid to a lawyer or a law firm other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:

    (1) Funds reasonably sufficient to pay bank charges may be deposited therein.

    (2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.

Code of Professional Responsibility, Maryland Rule 1230, Appendix F, Annotated Code of Maryland, and Article 10, Section 44 of the Annotated Code of Maryland.

*Findings of Fact: The Allen Case*

    Several complaints alleging commingling of funds have been lodged against the Respondent in what has been designated 'the Allen Complaint.' It was that complaint, brought before the Grievance Commission on May 29, 1984, that gave rise to the investigation into other escrow accounts held in Mr. Cockrell's name. Deposits into the First National Bank of Maryland account, the 'Allen

Complaint' account, by checks drawn on other accounts, alerted the Grievance Commission to the Union Trust and Equitable Trust accounts.

Respondent entered a continuous objection to the inclusion of the above-named bank records in the 'Allen Complaint' at a bench conference (T. 137) and later in a Supplemental Memorandum, dated May 23, 1985. Relying strenuously on *In Re Ruffalo*, [390 U.S. 544] 83 S.C. 1222 [20 L.Ed.2d 117] (1968), and *Bar Ass'n. v. Cockrell*, 274 Md. 279 [334 A.2d 85] (1975), Respondent contended that he did not receive proper notice of these charges. He also argued that these 'additional matters' should have been remanded to the Inquiry Panel.

Turning to the notice issue, the Court finds that *Ruffalo* and *Cockrell* are not supportive of Respondent's position. In *Ruffalo*, additional charges were brought against the accused attorney on the basis of his testimony in the state court proceeding. In Maryland, the proceedings referred to in *Ruffalo* begin when the Petition for Disciplinary Action is filed in the Court of Appeals. *Attorney Griev. Comm'n. v. McBurney*, 282 Md. 116, 124 [383 A.2d 58] (1978). The United States Supreme Court held that this absence of fair notice as to the precise nature of the charges deprived the attorney of procedural due process.

Similarly in *Cockrell*, the original charges were based on the testimony Cockrell had given at the first Panel Hearing. The disposition of the original complaint was referred to a new panel of judges for consideration of the supplemental charges. The Court of Appeals, relying on *Ruffalo*, concluded that these new charges could not form the basis for disciplinary action because the evidentiary foundation was 'tainted,' *supra* [274 Md.] at 287, [334 A.2d 85]. Judge Digges, *supra* [274 Md.] at 285 [334 A.2d 85], quoted for the Court from *Ruffalo*, *supra* [390 U.S.] at 551 [88 S.Ct. at 1226]:

The charge must be known before the proceedings commence. They become a trap when, after they are

underway, the charges are amended on the basis of the testimony of the accused. He can then be given no opportunity to expunge the earlier statements and start afresh.

Here, unlike the situation in *Cockrell, supra,* Respondent has known from the outset the nature of the charges against him. Respondent knew he was being charged with commingling of clients' funds at the Inquiry Panel proceedings. The purpose of an Inquiry Panel is investigatory in nature and informal to the extent that the rules of evidence need not apply. *Attorney Griev. Comm'n. v. Stewart,* 285 Md. 251, 259 [401 A.2d 1026] (1979); *McBurney, supra.*

As to notice, the above-cited cases stated:

More important, if a lawyer is given notice and the opportunity to defend in a full and fair hearing before a three-judge panel,[2] the question whether he was accorded due process of law by the Inquiry Panel and the Review Board is ordinarily immaterial.

[2] The three-judge panel mandated by Maryland Rule BV9 was amended in 1978. In Section d, 'judge or judges' was substituted for 'panel of judges.'

Accordingly, we find that Respondent was afforded notice and opportunity to defend following the institution of disciplinary proceedings in the Court of Appeals. Indeed, the charges brought in Paragraphs 23–26, *supra,* are not limited to the 'Allen Complaint' but address the complaints of clients in general.

At this point, we should also address Respondent's reliance on *Ruffalo* to support his allegations that Disciplinary Proceedings are quasi-criminal in nature thereby entitling the accused attorney to a claim of privilege. This reliance led Respondent to object to the introduction of his deposition into testimony. (T. 52). This Court finds that *Ruffalo* is inapposite. *Ruffalo* deals with notice and due process. Once again, we must look to Maryland law for guidance:

A disciplinary action against an attorney does not involve a potential criminal or quasi-criminal sanction for the purpose of the privilege against self-incrimination provided by the Fifth Amendment to the Federal Constitution. *Maryland State Bar Ass'n. v. Sugarman,* 273 Md. 306 [329 A.2d 1] (1974).

In support of the charges of commingling and misappropriating clients' funds, the Attorney Grievance Commission produced an expert witness, Mr. Bauer. Mr. Bauer testified that (1) Respondent had deposited his own funds into escrow accounts; (2) Respondent had deposited the funds of one client into an escrow account upon which he drew to pay other debts. This account resulted in several negative balances.

As to the first item, Mr. Bauer compiled four charts: An Analysis of Deposits of Attorney's Funds into the Paul J. Cockrell Escrow Account at First National Bank of Maryland, Account # 082–0002–2 (Petitioner's Exhibit No. 14, 15); . . . at Equitable Trust Company (Petitioner's Exhibit No. 16); and . . . at Union Trust Bank (Petitioner's Exhibit No. 17). The First National Bank Charts (Petitioner's Exhibits No. 14, 15) were the only ones analyzed during testimony. One chart indicated a series of checks for deposit from Capital Savings and Loan Association made out to Paul J. Cockrell for $2,550; $4,250; and $2,500 and American Express Money Orders on Capital Savings and Loan Association to Paul J. Cockrell from Paul J. Cockrell for $500, $300, $1,000, $650, and $500.

Next, Mr. Bauer turned to clients funds deposited in the First National Bank Account (Petitioner's Exhibit No. 14). As Mr. Bauer explained:

This is an analysis of the bank account with the starting date, the opening balance, January 7th of 1983, of zero... On January 19th, 1983, there was a check deposited for $9,350.00, and the check payee was James and Bessie Sommerville, individually, and Paul Cockrell, their attorney. This check was from Ohio Casualty and

indicated that the insured was Reginald Groom. Following that there were withdrawals from the account..... (T. 161).

Mr. Bauer then recites a series of withdrawals, none of which relate to the Sommerville settlement until February 2, 1983, when a check was issued to James Sommerville for $3,061.58. After more unrelated withdrawals, another check was issued to James Sommerville for $582.12. That check was returned for insufficient funds. At this point, Mr. Bauer testifies, the account shows a negative overdraft of $267.54.

Mr. Bauer concludes that:

For this all entire three pages the only money in there was that from the check issued to James and Bessie Sommerville of $9,350.00 on January 19th, since there was a zero balance when that was deposited in the account and there were no other deposits. (T. 164, 165).

When asked whether there were any other accounts whose balance fell below the amount of the deposit, Mr. Bauer testified:

...I believe it was in all three banks; First National, Union Trust, and Equitable. (T. 165).

When asked whether there were any other checks returned to clients for insufficient funds, Mr. Bauer replied:

On November 26th there was a check written to Mayor and City Council for Juanita Davenport for $912.91 at a time when there was $175.78.... (T. 166).

It should be mentioned that Mr. Bauer's thorough presentation presented excellent corroboration for the testimony of James L. Sommerville and Juanita Davenport, who preceded him. Both testified that they had engaged Mr. Cockrell as their attorney in personal injury suits. The settlement checks were handed over to Respondent. Subsequently, each had a check returned for insufficient funds.

Mr. Cockrell's general defense to his using escrow accounts for personal purposes was the economic instability of his personal and professional life. He alleges that because his personal accounts were being attached, he had to turn to his escrow accounts.

Mr. Cockrell never directly addresses the reasons for the negative balances in all three accounts. His defense consists of attempting to establish that Mr. Sommerville and Ms. Davenport had received all the monies due them. His Supplemental Memorandum, *supra* at 5, specifically addresses the $912.91 check # 1249 to Ms. Davenport from the Union Trust Account. Mr. Cockrell alleges that he had given her the check which she endorsed in return for cash which he paid her. However, he submits a photostatic copy of the front of the check only. Accordingly, we find merit in the Grievance Commission's allegations that Ms. Davenport never received the check or the cash. The records reflect that the check was never negotiated.

*Conclusions of Law: Allen Case*

The Court finds by clear and convincing evidence that the Respondent was commingling his personal funds and his client's funds in two First National Bank of Maryland accounts, # 082–0002–2 and # 053–8059–6, labeled Paul J. Cockrell, Attorneys Account; Union Trust Bank account # 313–23074, labeled Paul J. Cockrell, Attorney Escrow Account; and Equitable Trust Bank account # 604–0521–0, labeled Mr. Paul J. Cockrell, Attorneys Escrow Account. In addition, we find that the Respondent failed to maintain separate bank accounts for the deposit of funds of clients, and misappropriated the funds of one or more clients and converted such funds to his personal and/or business use as evidenced by the negative balances in all the above-named accounts. In light of the above, the Respondent clearly violated the disciplinary rules cited earlier."

Exceptions have been taken by both Bar Counsel and Cockrell. Bar Counsel excepts to the failure of the hearing judge to find that Cockrell violated Art. 10, § 44, Maryland Code. We agree and will sustain this exception. That section provides:

"(a)(1) ... In no event shall the attorney commingle any such funds [deposit or other trust moneys] with such attorney's funds or use any such funds for any purpose other than the purpose for which they were entrusted to the attorney."

Having found that Cockrell commingled and misappropriated the funds of his clients, it is obvious that he should also have been found to have violated section 44.

Cockrell, in his exceptions, does not clearly set forth his exceptions, but merely refers us to:

a. his Memorandum and Case Summary filed on May 21, 1985;

b. his Supplemental Memorandum and Case Summary filed on May 23, 1985;

c. "for reason set forth in all pleadings, testimony, and related data by Respondent ... as well as Respondent's Exhibits...";

d. and for reasons set forth in all pleadings, exhibits, testimony and other data set forth in the cases of

   1. *Smith v. Cockrell,* Case No: 7182–76, filed in the District Court of Maryland for Baltimore City on February 26, 1976.

   2. *Cockrell v. Smith,* Docket, 1979, Folio A–28, Case No. A–58305, in the Circuit Court for Baltimore City, filed January 8, 1979.

   3. *Smith v. Cockrell,* Case No. 1709–79, District Court of Maryland for Baltimore City, filed on January 16, 1979.

   4. *Smith v. Cockrell,* Docket 1981; Folio 806, Case No. 27243 in the Superior Court of Maryland for Baltimore City filed on May 28, 1981.

Cockrell next refers us to Case No. 209, September Term, 1980, of the Court of Special Appeals, specifically appellant's brief and subsequent "Writ of Certiorari to this Court." He also refers us to "appellants' consolidated Briefs Nos. 1452 and 1455, September Term, 1982," along with subsequent Petition for Writ of Certiorari to this Court.

Cockrell also refers us to the case of "Paul J. Cockrell, et ux. (v) GEORGE L. RUSSELL, JR., et al., Case No. HAR 83–3911 filed in the United States District Court for the District of Maryland on November 14, 1983...."

Finally, we are referred to "a MEMORANDUM AND CASE SUMMARY filed or intended to be filed in support of the within EXCEPTIONS TO STATEMENT OF THE COURT; FINDINGS OF FACT; AND CONCLUSIONS OF LAW, in the above-captioned case...." (No such memorandum has been filed, however.)

Cockrell requests that all of the above be incorporated herein by reference and made a part hereof.

In our view Cockrell has not properly excepted to the hearing judge's findings and conclusions. What he has done is to leave it up to us to ferret out his exceptions for him; this we decline to do.

As we stated above, we agree with the findings of fact and conclusions of law made by the hearing judge. Thus, having concluded that Cockrell violated several disciplinary rules, the appropriate sanction remains to be determined. Bar Counsel seeks disbarment; what Cockrell urges is not at all clear.

In our view, where an attorney is found to have seriously neglected cases entrusted to him by clients and, most particularly, has commingled clients' funds with his and misappropriated funds of his clients in several instances, disbarment is the appropriate sanction. We have consistently held that when an attorney is found to have betrayed the high trust imposed in him by appropriating to his own use funds of others entrusted to him, then, absent the most

compelling extenuating circumstances, disbarment should follow as a matter of course. *See Attorney Griev. Comm'n v. Velasquez*, 301 Md. 450, 483 A.2d 354 (1984), and cases cited therein. We find no such compelling circumstances here. This violation alone would be sufficient to call for disbarment. Here, however, we have other Disciplinary Rule violations mainly concerned with neglect. Keeping in mind the purpose of disciplinary proceedings, being to protect the public and not to punish an offending attorney,[5] we feel constrained to impose disbarment in this case.[6] Thus it follows that the name of Paul J. Cockrell shall be stricken from the rolls of those entitled to practice law in this State.

IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE BV 15 c, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST PAUL J. COCKRELL.

---

**5.** *Attorney Griev. Comm'n v. Howard*, 282 Md. 515, 385 A.2d 1191 (1978); *Attorney Griev. Comm'n v. Stewart*, 285 Md. 251, 401 A.2d 1026, *cert. denied*, 444 U.S. 845, 100 S.Ct. 89, 62 L.Ed.2d 58, *rehearing denied*, 444 U.S. 975, 100 S.Ct. 472, 62 L.Ed.2d 391 (1979).

**6.** We observe that Cockrell has previously been suspended from practice for six months. *See Bar Ass'n v. Cockrell*, 274 Md. 279, 334 A.2d 85 (1975).