IN THE MATTER OF JAMES SPAGNOLI, AN ATTORNEY AT LAW.

Argued March 14, 1989—Decided July 7, 1989.

*David E. Johnson, Jr.*, Director, argued the cause on behalf of Office of Attorney Ethics.

*Richard H. Kress* argued the cause for respondent.

PER CURIAM.

This matter involves an attorney-disciplinary proceeding prompted by fifteen complaints filed against respondent, James V. Spagnoli. The complaints allege a pattern of neglect, gross negligence, a lack of due diligence in representation, failure to communicate with clients, and failure to return clients' files. The respondent is also charged with having made a misrepresentation to the court and with failure to cooperate in the disciplinary proceedings. Respondent's conduct, termed an "ethical violations spree" by the Disciplinary Review Board

(Board or DRB), prompted a five-member majority of the Board to recommend disbarment. Three members would have imposed a three-year suspension to be continued indefinitely until the respondent could demonstrate that he was fit to resume the practice of law. After a thorough and independent review of the record, we adopt the disposition recommended by a majority of the DRB.

I.

The facts as developed before the district ethics committee were fully and accurately summarized by the DRB. These facts relate in detail the circumstances surrounding the ethical violations.

## "The Christoffersen Matter

"John E. Christoffersen ('Grievant') retained respondent in September or October 1984 to represent him in a matrimonial action, at which time he paid respondent a $1,500.00 retainer. On October 25, 1984, grievant signed a complaint for divorce. He requested respondent file the complaint immediately, but not have it served until grievant's return from vacation in December. On several occasions in the fall of 1984, respondent assured grievant that "everything was taken care of". On March 19, 1985, six months after he instructed respondent to file a complaint in his behalf, grievant was served with a divorce complaint filed by his wife. Respondent then agreed to file an answer and counterclaim and a *pendente lite* motion.

"On March 20, 1985, grievant was told that the answer and counterclaim and the motion had been filed. On May 19, 1985, a default judgment was entered against him. He discovered then that respondent had not filed any pleadings in his behalf. Between May 30, 1985, and June 21, 1985, grievant attempted to contact respondent by telephone, but his calls were not returned. On June 6, 1985, grievant sent respondent a telegram terminating his services. Grievant then retained new

counsel, who was successful in vacating the default. The Clients' Security Fund reimbursed to grievant the total retainer of $1,500.00.

## "The Headley Matter

"Ruth Headley ('Grievant') retained respondent in August 1984 to represent her in connection with a potential interest in her ex-husband's pension benefits. On numerous occasions grievant attempted to contact respondent, without receiving a return phone call. Dissatisfied with respondent's representation, in August 1985, grievant requested that respondent return her file. Although she called respondent's office almost daily for a week, her calls remained unanswered. On a particular occasion, grievant was told that her file could not be returned to her, only to another attorney.

"In August 1985, grievant appeared at respondent's office, unannounced. She was told that she could not have the file because it had to be copied. After the presenter in this matter contacted respondent's office, grievant was informed that the file would be available at respondent's office. Once again, when she appeared at respondent's office, she was unable to secure her file. Although she wrote a letter to respondent on November 21, 1985, as of the date of the ethics hearing, January 27, 1986, respondent had not returned her file. When grievant consulted with new counsel, he would not agree to represent her without prior review of the file.

## "The Kudla Matter

"Kathleen A. Kudla ('Grievant') paid respondent a $1,475.00 retainer on May 3, 1984, for representation in a divorce action filed by her husband in April 1984. Pursuant to respondent's testimony, he dictated an answer and counterclaim on June 15, 1984, having instructed his secretary to have the affidavit of verification and non-collusion signed and the documents properly filed with the court. On July 2, 1984, respondent acknowl-

edged service of the complaint for divorce against grievant. On August 20, 1984, respondent's adversary in the matter filed a request to enter default. On September 19, 1984, a default judgment was entered against grievant. The judgment provided that equitable distribution of assets had already been accomplished, pursuant to agreement by the parties. That was untrue.

"Upon discovering the judgment, grievant met with respondent, who informed her the court had apparently lost her file and he would have to make an application to set aside the default. Respondent testified he prepared a notice of motion and certification in November 1984, again delegating to his secretary the responsibility for the filing of the documents. Upon inquiries in October 1984, November 1984, and January 1985, grievant was informed by respondent that the papers had been filed. On March 3, 1985, upon reviewing the court file, grievant discovered the motion had not been filed. Accordingly, she wrote to the judge, requesting information about the status of her case. By letter dated April 3, 1985, the judge advised her a default had been entered against her. Pursuant to respondent's testimony, on April 27, 1985, he found the answer and counterclaim and the notice of motion in an unrelated file.

"On May 28, 1985, respondent was contacted by an attorney with whom grievant had consulted. Thereafter, respondent took no further steps to represent grievant. On July 22, 1985, respondent received a letter from yet another attorney, requesting grievant's retainer be returned, along with her file. When respondent did not return the file or the fee, the attorney was forced to file a motion seeking the return of both. The motion was granted. Although the court order provided for personal service upon respondent, service was made on a secretary in respondent's office. Respondent, however, admitted knowledge of its contents. As of September 22, 1985, he had not returned the file to grievant or her attorney, in spite of the court order. Grievant testified, also, that she had considerable difficulty in

reaching respondent throughout their professional relationship. Respondent did not return her telephone messages and cancelled 20—25 appointments with her.

"Respondent's neglect of the matrimonial matter caused grievant financial injury. In one particular instance, because of respondent's inaction, she was forced to pay storage charges for a boat kept in a marina, which boat was an asset subject to equitable distribution.

## "The Imes Matter

"Shirley Imes ('Grievant') retained respondent in late November or early December 1984 to represent her in a matrimonial matter. At that time, grievant informed respondent that she was in dire financial straits and instructed him to file a motion for support forthwith. Respondent assured her that the matter would be before the court within two weeks. From December 1984 through February 1985, grievant had considerable difficulty in contacting respondent. She was finally able to reach him in February 1985, at which time she was advised the motion would be heard in two weeks. Although a notice of motion was indeed filed on March 11, 1985, it was not heard until August 2, 1985, as a result of adjournments requested by respondent's adversary. On the return date, respondent failed to appear.

"By letter dated June 26, 1985, grievant advised respondent of her dissatisfaction with his representation and requested a refund of her retainer. Respondent ignored her request. Once again, in August 1985, grievant expressed her unhappiness and informed respondent that she was terminating his representation, having retained new counsel. In December 1985, she requested the return of her file. As of the date of the ethics hearing, April 1, 1986, the file had not been returned.

## "The Burslem Matter

"In August 1985, Gloria Burslem ('Grievant') paid a $1,500.00 retainer to respondent for the preparation of a property settle-

ment agreement. In October 1985, when she inquired about the status of the matter, respondent informed her that the delay in the preparation of the agreement was the fault of her husband's attorney. He added he had written several letters to the attorney and had tried to call him several times, all to no avail. Between October 1985 and January 1986, grievant attempted to contact respondent, unsuccessfully. When she was finally able to reach him, she requested copies of the letters written to her husband's attorney. Respondent hung up on her. On February 18, 1986, grievant telephoned her husband's attorney. She discovered respondent had not contacted the attorney at all, with the exception of an initial letter written in August 1985.

"On April 23, 1986, grievant requested respondent send her file to her new attorney. When respondent ignored her request, the attorney interceded in her behalf. His efforts were also unavailing. Pursuant to grievant's testimony, respondent's inaction detrimentally affected her position with regard to the negotiation of the property settlement agreement.

## "The Cook Matter

"In January 1986, Deborah Cook ('Grievant') paid respondent a $900.00 retainer for representation in certain post-judgment matrimonial matters and a bankruptcy case. Although another attorney in respondent's office eventually filed the bankruptcy petition, after a complaint by grievant, respondent never filed any pleadings in connection with her matrimonial matters. This notwithstanding, he misrepresented to grievant the papers had been filed and her ex-husband had been served.

"Beginning in May 1986, grievant asked respondent for the return of her file at least a dozen times. As of the date of the ethics hearing, November 14, 1986, respondent had not complied with her request, to grievant's financial detriment. Specifically, she was forced to work 18 to 25 hours a week overtime as a result of her inability to seek an increase in child support.

## *"The (John) Arendt Matter*

"Early in 1986, John Arendt ('Grievant') retained respondent to object to a motion filed by his ex-wife, seeking to hold him in contempt for failure to make child-support payments. Although the motion was originally returnable on January 17, 1986, it was adjourned to March 7, 1986. Respondent neither filed an objection to the motion in grievant's behalf, nor appeared in court on the return date of the motion. As a result, the court entered an order holding grievant in contempt and requiring him to convey his one-half interest in the marital home to his ex-wife.

"When grievant apprised respondent of the contempt order, respondent offered to file a motion to vacate it. On March 21, 1986, he prepared an affidavit in support of the motion. As of July 10, 1986, four months later, grievant had not been told whether the motion had been filed. When grievant sought to obtain the return of his file, directly at first, and then through his new attorney, respondent refused to release it. As of the date of the ethics hearing, September 19, 1986, respondent had not returned the file to grievant. As of that same date, the judgment which grievant's ex-wife obtained against him was still in effect.

## *"The Joan Arendt Matter*

"Grievant, Joan Arendt, is the current wife of John Arendt, the grievant in the preceding matter. In August 1985, respondent undertook to represent her with regard to a post-judgment matrimonial matter. On August 21, 1985, grievant's ex-husband signed a deed transferring his interest in the former marital home to her, which deed was promptly forwarded to respondent for recording. Not having received the recorded deed within a reasonable time, grievant made frequent telephone calls to respondent, inquiring about the status of the matter. Invariably, respondent would furnish grievant with various and conflicting stories as to why the deed still had not

been recorded, including the loss of the deed by the clerk's office and its misfiling by respondent's office. As of the date of the filing of the ethics complaint, one year after the deed had been signed, respondent still had not recorded the deed. As a result, grievant was forced to hire new counsel to have the deed properly recorded.

### "The Perrotti Matter

"Nancy Perrotti ('Grievant') retained respondent to represent her with regard to certain post-judgment matrimonial matters. On August 16, 1985, grievant and her ex-husband reached an agreement, which was placed on the record. Eleven months thereafter, however, the order incorporating the terms of the agreement still had not been submitted for the court's signature. Although respondent testified his adversary was responsible for the preparation of the proposed form of order, he took no steps to submit the order himself, after he discovered the order had not been prepared by his adversary within a reasonable period of time. Without the order, grievant was unable to enforce her right to child support and to the distribution of marital assets.

"On numerous occasions, grievant attempted to contact respondent to inquire about the order. Her telephone calls were ignored. On April 10, 1986, grievant appeared at respondent's office to request the return of her file. Pursuant to grievant's testimony, respondent replied 'you made me wait for my payment. Now, when I'm good and ready, I will give you the file.' (Citation omitted.) Subsequent letters to respondent requesting the return of the file produced no results.

"Respondent's conduct caused substantial financial injury to grievant inasmuch as she had not received any child support payments since October 1985. Similarly, she has not received the proceeds of the sale of two lots totalling $5,500.00, designed to satisfy her ex-husband's support arrearages as of the date of the agreement.

## "The Huneke Matter

"Helen Huneke ('Grievant') consulted with respondent on May 3, 1985, to discuss the filing of an employment discrimination claim in her behalf. On June 2, 1985, she paid respondent a $1,500.00 retainer. Between June and July 1985, grievant or her husband called respondent's office 42 times. She was invariably told respondent was either on the phone, in conference or out of the office. The only phone call respondent returned was on December 16, 1985, shortly after she contacted the secretary of the district ethics committee. At a meeting in December, respondent indicated the complaint had already been filed. In fact, respondent never filed any pleadings in her behalf.

"By letter dated July 23, 1986, grievant informed respondent that she no longer wished him to represent her. She consulted with another attorney who was unwilling to undertake representation prior to review of the file. On July 24, 1986, new counsel wrote to respondent requesting the return of grievant's file. As of the date of the ethics hearing, October 3, 1986, the file still had not been released. The Clients' Security Fund reimbursed the total retainer of $1,500.00.

## "The Small Matter

"William Small, Jr. ('Grievant') retained respondent to represent him in a divorce matter. On August 18, 1986, grievant and his wife reached an agreement, which was placed on the record. Respondent agreed to submit within 30 days thereof the proposed form of judgment incorporating the terms of the agreement.

"Following the hearing, grievant attempted to obtain an appointment with respondent to discuss the form of the judgment or, more specifically, the revision of certain provisions of the judgment which grievant believed to be inaccurate. Unable to obtain an appointment, on October 28, 1986, grievant wrote to respondent setting forth the pertinent revisions. When he

did not receive a response, grievant contacted the trial judge, who wrote to both counsel on November 29, 1986, directing that respondent's adversary prepare the form of judgment, with a copy being sent to grievant. On December 24, 1986, grievant received a copy of the signed judgment from his ex-wife's attorney. Upon reviewing said judgment, he discovered the inaccuracies that he had raised with respondent had not been corrected. Respondent then agreed to order a copy of the transcript and to file a motion to modify the judgment. The motion was never filed.

### "The Sloane Matter

"In September 1986, respondent agreed to represent Anna M. Sloane ('Grievant') in connection with a divorce action. She paid him a $400.00 retainer and instructed him to file the divorce at the earliest opportunity. She explained she wished the divorce finalized prior to the birth of her child because she intended to resume her maiden name and to give the baby her surname. Respondent assured her she would be divorced by the end of 1986. On a subsequent occasion, when grievant asked respondent about the filing of the complaint, he represented to her it had already been filed and that there was no need for her to sign any documents.

"Around Thanksgiving of 1986, grievant telephoned respondent to inquire about the status of her matter. Respondent informed her that the complaint had already been filed and forwarded to the sheriff's office for service. In mid-December of 1986, grievant called the sheriff's office. She was informed that the summons and complaint had not been received. She then called the Superior Court clerk's office and discovered the complaint had never been filed. In January 1987, grievant both orally and in writing requested respondent return her retainer and her file. Respondent ignored her request. The Clients' Security Fund reimbursed grievant $500.00.

## "The Wigfall Matter

"In August 1985, Edna Wigfall ('Grievant') retained respondent to represent her in a divorce action filed by her husband. She paid him a $935.50 retainer. During a court appearance, after the attorneys conferred with the judge, respondent told grievant the court would schedule a new date for the divorce trial. Subsequently, respondent received from her husband's attorney a copy of a Supplemental Final Judgment of Divorce dated September 26, 1986, which stated the matter had been called for trial on April 2, 1986, no one having appeared in her behalf. Respondent neither notified grievant of the April 2 date nor appeared for the trial. When she showed the judgment to respondent, he told her 'it was impossible.' He promised grievant he would have a conference with the judge and would promptly advise her of its outcome. Subsequently, grievant attempted to reach respondent on numerous occasions, including written requests for information, without any response whatsoever from respondent. A claim is presently pending with the Clients' Security Fund.

## "The Solomine Matter

"On March 9, 1987, Ruth Solomine ('Grievant') paid respondent a $525.00 retainer to object to a notice of motion filed by her ex-husband concerning custody and visitation of the parties' son. The motion was returnable on March 13, 1987. On March 9, grievant and her son met with respondent, at which time she signed blank certifications dated March 12, 1987. Between March 16 and April 1, 1987, grievant called respondent's office on a daily basis. On that last day, she was advised respondent had been suspended from the practice of law.

"Upon receiving her file, grievant found copies of two certifications marked 'filed' with the Superior Court clerk's office on March 17, 1987. She then personally delivered them to the judge, who agreed to carry the matter until she was able to obtain new counsel. She also discovered a copy of a letter

which respondent had forwarded to the court after the return date of the motion, referring to the fact that the motion had been heard on the previous Friday and requesting an adjournment on the ground that grievant had been out of state. That was false."

At the conclusion of the hearings, the committee concluded the respondent had been guilty of

gross negligence in ten matters; of a pattern of neglect in seven matters; of lack of due diligence in representing clients in seven matters; of failure to communicate with the client in four matters; of failure to return the clients' files in nine of these matters; and of making a misrepresentation to the court in one matter. Although the committee acknowledged respondent had not cooperated with the investigation of the ethics matters in nine of the 15 matters, it only charged respondent formally with non-cooperation in one instance. The committee found that respondent violated RPC 1.1(a) and (b), RPC 1.3, RPC 1.4, RPC 1.16(d), RPC 3.3(a) and RPC 8.1(b). The committee recommended that respondent receive public discipline.

The DRB noted that as of the date of its hearing, the Clients' Security Fund (Fund) has been required to reimburse thirteen clients a total of $14,750 for what it termed "completely unearned retainers." As of this date, $15,950 has been paid out by the Fund; an additional $1,735.50 has been approved for payment. One claim remains pending.

The DRB found that the conclusions of the ethics committee were fully supported by clear and convincing evidence.

The Board finds that, in all but two of the fourteen matters under review, respondent was guilty of gross negligence. Conduct evidencing a pattern of neglect was found in six of those matters. In seven matters, respondent failed to take initial action by not preparing or filing any papers * * *. In some instances, default judgments or contempt orders were entered against clients * * *. In three cases, respondent failed to appear in court * * *. In three matters, he misrepresented to the client the papers had been filed or the delay in preparing the documents was caused by his adversary * * *. In the Solomine matter, he lied to the court when he requested an adjournment on the basis that his client was out-of-state. In eight matters, he failed to communicate with the clients or to respond to their reasonable requests for information. In eight instances, he refused to return the clients' files, as requested. In one matter, he ignored a court order providing for the return of the file * * *. In at least two cases, * * * he refused to refund unearned retainers.

In addition, the DRB concluded that respondent had defrauded his clients:

Respondent did not act with gross negligence alone. He acted with malice. The record reveals that, in the majority of the matters, respondent never intended to take any action to safeguard his clients' interests from the outset of the representation. This is not the case where the attorney undertakes the representation, receives a retainer, files the initial pleadings and subsequently loses interest in the matter. Here, respondent accepted the clients' money, promised to take legal action in their behalf, induced the clients to rely on his promise, all the while never intending to take any steps whatsoever to protect the clients' property—and in some cases liberty—to the clients' great detriment. Respondent did not only abandon his clients. He defrauded them.

The Board also emphasized that respondent had failed to cooperate with the ethics proceedings. Respondent did not answer eight of the fifteen complaints instituted against him. He failed to appear at five of the scheduled hearings, covering nine of the ethics matters. He also failed to appear at the Board hearing. The Board noted that an attorney has a duty to file an answer to an ethics complaint within the time prescribed by the Rules of the Court, *In re Kern*, 68 *N.J.* 325, 326 (1975), as well as a duty to cooperate with the committee's proceedings. *In re Grinchis*, 75 *N.J.* 495, 496 (1978).

The DRB also noted that this was not respondent's first encounter with the disciplinary system. In 1982 he received a public reprimand for signing a client's name on three separate affidavits filed with the court. *In re Spagnoli*, 89 *N.J.* 128 (1982).

The DRB found that respondent's conduct merited disbarment.

Respondent's failure to conform to the high standards required of the profession after receiving a public reprimand, coupled with the grievous ethical breaches that followed it, leads the Board to the inescapable conclusion that his professional character is beyond rehabilitation. Respondent's repetitive, unscrupulous acts reveal not only a callous disregard for his responsibilities toward his clients and disdain for the entire legal system, but a deficiency in his character. He embarked on a predetermined course of conduct designed to defraud those who sought his legal protection, entrusting him with their property and freedom alike, namely, his clients.

\* \* \* \* \* \* \* \*

The Board concludes that the record shows that respondent's conduct is incapable of mitigation. A lesser sanction than disbarment will not adequately protect the public from this attorney, who has amply demonstrated that his

"professional good character and fitness have been permanently and irretrievably lost." *Matter of Templeton, supra,* 99 *N.J.* 365, at 376 (1985).

By order dated March 30, 1987, respondent was temporarily suspended from the practice of law until further order of the Court. Respondent has ceased practicing law and remains suspended.

This Court issued an order to show cause why respondent should not be disbarred or otherwise disciplined.

## II.

 This Court's role in disciplinary matters is to "protect the public interest and ensure that public confidence in the legal profession is not diminished." *In re Goldstaub,* 90 *N.J.* 1, 5 (1982). "The purpose of discipline is not to punish the offender, but is to protect the public from the attorney who does not meet the standards of responsibility of his profession." *In re Barbour,* 109 *N.J.* 143, 161 (1988). It should be borne in mind that any one attorney's transgressions "reflect on the competency and integrity of the entire Bar." *In re Barry,* 90 *N.J.* 286, 291 (1982). "The severity of discipline to be imposed must comport with the seriousness of the ethical infractions in light of all the relevant circumstances." *In re Nigohosian,* 88 *N.J.* 308, 315 (1982).

As noted, respondent does not contest the factual findings or recommendations of the DRB. *Supra* at 507–08. Rather, respondent maintains his actions do not warrant disbarment.

We are in accord with both the findings of the DRB and its recommendation. As the DRB held:

Respondent's egregious conduct transcends the matters heretofore reviewed by this Board and the Supreme Court where numerous instances of gross negligence and conduct evidencing a pattern of neglect have warranted a long-term suspension from the practice of law. * * * Respondent did not act with gross negligence alone. He acted with malice.

On a full review of the record, it is clear that respondent took fees from his clients while never intending to represent them. When neglect and negligence rise to this level, they take on the

characteristics of fraud. The frequency and repetitious pattern of these violations, involving fourteen incidents in three years, reflects a practice by respondent of accepting retainers without ever intending to act on behalf of his clients. *In re Goldstein,* 97 *N.J.* 545, 548 (1984); *In re Dailey,* 87 *N.J.* 583, 594 (1981). Respondent falsely represented to clients that he would assume responsibility for their representation, but did nothing in their behalf. He lied about the status of their suits. Even after adverse judgments had been entered against his clients, respondent failed to take any action to assist or represent them. When his neglect of duty placed his clients' interests in jeopardy, he refused to speak with them when they telephoned or when they appeared at his office. He consistently failed to appear at scheduled court dates. Respondent did not simply *fail* to return clients' files, he *refused* to do so.

Respondent argues that he did not "act willfully deceitful[ly] or fraudulent[ly] in any situation * * *. He did not have any personal or monetary gain from any of the circumstances." However, we note that the Clients' Security Fund has paid or approved reimbursement to respondent's clients in the amount of $17,685.50. A predicate to the Fund's reimbursement of clients is a determination that an attorney has acted dishonestly. *R.* 1:28–3.

In addition to respondent's misrepresentations to his clients, respondent lied to the court in order to excuse his failure to appear in court. As we remarked on another occasion:

Lying to a judge—no matter how white the lie—can never be lightly passed off. The destructive potential of such conduct to the justice system warrants stern sanction. [*Matter of Johnson,* 102 *N.J.* 504, 511 (1986).]

Respondent's failure to cooperate with the ethics proceedings was inexcusable. He offered virtually no response to many of the complaints filed against him. He repeatedly failed to appear before the ethics committee. He did not attend the hearing before the DRB. As the Board observed:

Respondent's willful disregard for the solemnity of the ethics proceedings cannot be countenanced * * *.

* * * * * * * *

Respondent's cavalier attitude to his ethical responsibilities cannot be tolerated. It shows contempt toward his clients, the profession and the entire judicial system.

At oral argument, we were informed that respondent's ethical transgressions and professional difficulties were substantially attributable to respondent's marital problems and to substance abuse during the critical period in which these violations occurred. No evidence of these matters was produced before the district ethics committee or the DRB. We have previously acknowledged our deep concern over the application of our disciplinary rules in cases involving substance abuse. *See In re Hein,* 104 *N.J.* 297, 304–05 (1986). It is a source of profound regret when such conditions contribute to the destruction of a promising professional career.

In view of the severity of the multiple ethical violations committed, combined with respondent's failure to appear before the DRB and participate fully in the district ethics committee proceedings, we order that respondent be disbarred. Respondent shall reimburse the Ethics Financial Committee for administrative costs.

O'HERN, J., dissenting.

I am increasingly unable "to draw the lines of moral quality" that the Court thinks it can. *In re Conway,* 107 *N.J.* 168, 190 (1987) (O'Hern, J., dissenting). The respondent has been found guilty of no crime, has not committed a *Wilson* violation, and yet he is to be disbarred. What distinguishes his conduct from so many others who are not disbarred?

Because I see no need to besmirch the names of attorneys previously disciplined by the Court, I will not refer to their cases by name, although the precedent is well known to the Court.

An attorney who had been convicted of misusing the funds of minors in his custody has been restored to practice.

An attorney who had committed eleven instances of neglect, misrepresented the status of cases to his clients, kept retainers that he had not earned, and "displayed an indifference to the justice system in his failure to confront the ethics charges" has been restored to practice.

An attorney whose ethical infractions included "a pattern of neglect in his handling of his clients' legal matters," such as "fail[ing] to carry out contracts of employment, * * * ke[eping] retainers without performing services * * *, commingl[ing] clients' trust funds, * * * fail[ing] to account to his clients," and most importantly, misusing clients' funds, has been restored to practice.

A prosecuting attorney who removed drugs from the County's evidence locker to share with a female informant and another, was found to have been suffering from "extreme personal stress." We observed that "[d]uring that period, he lost his ethical compass and went astray. In the interim, he has found his bearings." He will someday be restored to practice.

Just how does the Court draw these lines of moral quality? The Disciplinary Review Board is unable to perceive them. In this case, it was divided five to three with respect to the discipline to be imposed. In part, I suspect that was because respondent made no effort to defend himself before that committee.

This is a most unusual case. Respondent was about to be disbarred without ever appearing in our Court and his ex-wife asked whether we should not seek to know what explained his seemingly aberrant misconduct. An attorney who has stepped forward to plead the case of respondent brought to our attention that during this period from 1984 to 1987 respondent was going through a divorce. He was deeply disturbed by the breakup of his family and the change in personal relationships that he could not reconcile.

I cannot perceive a stark difference between respondent and others whom we have restored to practice. Accordingly, I would adopt the recommendation of the three members of the

Disciplinary Review Board that would impose a three-year suspension, to be continued indefinitely thereafter until respondent is able to demonstrate that he is fit to resume the practice of law.

*For disbarment*—Justices CLIFFORD, HANDLER, POLLOCK, GARIBALDI and STEIN—5.

Justice O'HERN has filed a separate dissenting opinion—1.

*For suspension*—1.

## ORDER

It is ORDERED that JAMES V. SPAGNOLI of ELIZABETH, who was admitted to the bar of this State in 1969, be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that JAMES V. SPAGNOLI be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that respondent comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with disbarred attorneys; and it is further

ORDERED that respondent reimburse the Ethics Financial Committee for appropriate administrative costs.