**In the Matter of Nicholas ADDAMS, Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals.**

**No. 88–867.**

District of Columbia Court of Appeals.

Argued En Banc March 9, 1990.

Decided Aug. 6, 1990.

---

that respondent be disbarred and four members recommended that he be suspended for one year and a day. Before the court Addams contended that the record did not support the Board's findings, and, alternatively, that the appropriate sanction was suspension for no more than one year. A division of this court held that the record supported the Board's findings of disciplinary violations and that, in view of our decision in *In re Buckley*, 535 A.2d 863 (D.C.1987), disbarment was the appropriate sanction. *In re Addams*, 563 A.2d 338 (D.C.1989). On January 24, 1990, the court granted respondent's petition for rehearing en banc, and vacated the division opinion, in order to consider whether there should be a *per se* disbarment rule for intentional misappropriation and, if not, the extent to which mitigating factors are relevant in determining the appropriate sanction. Order of February 27, 1990.

R. Kenneth Mundy, Washington, D.C., for respondent.

Samuel McClendon, Washington, D.C., Asst. Bar Counsel for Sp. Litigation, with whom Thomas E. Flynn, Bar Counsel, was on the brief, for the Office of Bar Counsel.

Joan L. Goldfrank, Washington, D.C., Executive Atty., for four members of the Bd. on Professional Responsibility recommending against disbarment.

Before ROGERS, Chief Judge, NEWMAN, FERREN, BELSON, STEADMAN, SCHWELB, FARRELL, Associate Judges, and GALLAGHER, Senior Judge.

ROGERS, Chief Judge:

This matter was originally before the court on the Report and Recommendation of the Board on Professional Responsibility (the Board). The Board unanimously found that respondent Addams violated DR 9–103(A) (misappropriation) and DR 1–102(A)(4) (dishonesty) as a result of intentionally misappropriating client funds and misrepresenting the fact to his client. Four members of the Board recommended

We now reaffirm that in virtually all cases of misappropriation, disbarment will be the only appropriate sanction unless it appears that the misconduct resulted from nothing more than simple negligence. While eschewing a *per se* rule, we adhere to the presumption laid down in our prior decisions and shall regard a lesser sanction as appropriate only in extraordinary circumstances. We have found such circumstances in *In re Kersey*, 520 A.2d 321 (D.C. 1987), and may find other circumstances calling for a lesser sanction in the future. But, as a matter of course, the mitigating factors of the usual sort, *see, e.g., In re Reback*, 513 A.2d 226, 233 (D.C.1986) (en banc), will suffice to overcome the presumption of disbarment only if they are especially strong and, where there are aggravating factors, they substantially outweigh any aggravating factors as well. In this case, the mitigating factors fail to meet this standard. Accordingly, we order that Respondent Addams shall be disbarred.

I

The decision of the division sets forth in detail the evidence on which the Board unanimously found that Respondent Ad-

dams had violated DR 9–103(A)[1] and DR 1–102(A)(4)[2] by the intentional, unauthorized use of funds given him by his client, Norlisha Jackson, for placement in a trust account to pay the holder of Ms. Jackson's promissory note. *In re Addams, supra,* 563 A.2d at 339–341. We incorporate Parts I and II of the division opinion upholding the findings of the Board of disciplinary violations save only to clarify that we view Ms. Jackson to have been at all times the owner of the funds in the escrow account. *See id.* at 341.

## II

■ Turning to the issue of sanction, the court is deciding *de novo* what is the appropriate sanction for Addams' intentional misappropriation of client funds.[3] As the opinion by the division makes clear, the members of the Board recommending disbarment acknowledged that this is an unusual case since Addams' client, Ms. Jackson, was satisfied with Addams' representation and Addams was brought to the attention of the Board by the losing party in the lawsuit which Addams won for his client. *Id.* at 342. These factors, as well as differing views on the effect of the usual mitigating factors,[4] caused the Board to split on its recommendation to the court of an appropriation sanction.

The four members of the Board recommending that Addams be disbarred relied on *Buckley, supra,* 535 A.2d 863. Buckley was disbarred for violating DR 9–103(A) and DR 1–102(A)(4) by commingling and misappropriating client funds which he was supposed to hold in trust to pay his client's medical bills, notwithstanding the existence of a number of mitigating factors.[5] These Board members found that Addams' "misappropriation, like Buckley's, was knowing and intentional," and they viewed Addams' concealment of the withdrawals in the false accounting that he gave to his client to be an aggravating factor. They found no mitigating factors adequate to form a "basis to impose any sanction other than that which is called for by *Buckley*," interpreting *Buckley* to stand for the proposition that "the absence of prior discipline is not a factor which serves to mitigate a sanction in a misappropriation case," and they rejected as irrelevant the substantial legal

1. DR 9–103 Preserving Identity of Funds and Property of a Client.
   (A) All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:
   (1) Funds reasonably sufficient to pay bank charges may be deposited therein.
   (2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.

2. DR 1–102 Misconduct.
   (A) A lawyer shall not:

   . . . . .

   (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

3. Under D.C.Bar Rule XI, § 7(3) the court will "adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable

conduct or otherwise would be unwarranted." Where the Board is evenly split, the court, "[w]ithin the limits of the mandate to achieve consistency," must decide each case on its own particular facts. *In re Haupt,* 422 A.2d 768, 771 (D.C.1980).

4. The usual mitigating factors include the absence of prior discipline, admission of wrongdoing, cooperation with Bar Counsel, and restitution to the client. *See In re Reback, supra,* 513 A.2d at 233. These factors are distinct from the broader considerations relevant to the determination of appropriate discipline such as "the nature of the particular violation, the need to protect the public, the courts and the legal profession." *Id.* (quoting *In re Smith,* 403 A.2d 296, 303 (D.C.1979)).

5. The Board on Professional Responsibility had found five mitigating factors. Those factors were: (1) the confusion or uncertainty for a period of time about who was responsible for paying the medical bills; (2) the slight harm suffered by the client since Buckley eventually made the necessary payments; (3) misconduct limited to a single matter involving one client; (4) Buckley's candor in the disciplinary proceedings; and (5) his thirty years of practice without prior discipline. 535 A.2d at 866.

fees Ms. Jackson owed Addams since they viewed such consideration "the functional equivalent of arguing that Addams had no 'corrupt intent.'" They also declined to view client satisfaction as having anything to do with sanction, concluding that it did not alter the Board's responsibility to protect "the entire consuming public."

The other four members of the Board, who recommended a suspension, relied on six mitigating factors, comparable to those in *Buckley,* in concluding that suspension for a year and a day was the appropriate sanction.[6] They, too, noted that the complainant was the losing defendant in the client's lawsuit, and maintained that their reliance on these mitigating factors was not an attempt to probe the degree of corruptness of Addams' intent but simply an effort to avoid a "mechanistic *per se* approach."[7]

■ The Board did not find that Addams' intent in misappropriating funds was "corrupt" or would satisfy the *mens rea* for theft or embezzlement under the criminal laws. No such finding is required, see note 9, *infra,* and the court, like the Board, has no occasion to stigmatize Addams' conduct unnecessarily in this opinion as "theft" or "embezzlement." Subject only to that qualification, it is appropriate to begin our discussion with an observation of the court a generation ago in *In re Quimby,* 123 U.S.App.D.C. 273, 274, 359 F.2d 257, 258 (1966):

The administration of justice under the adversary system rests on the premise that clients and the court must be able to rely without question on the integrity of attorneys. An act against a client evidencing moral turpitude, even though attributable to some aberration or stress that would warrant the prosecutor in abstaining from criminal prosecution, may nevertheless warrant severe disciplinary action concerning an officer of the court.

When a member of the bar is found to have betrayed his high trust by embezzling funds entrusted to him, disbarment should ordinarily follow as a matter of course. Such misconduct demonstrates absence of the basic qualities for membership in an honorable profession. Only the most stringent of extenuating circumstances would justify a lesser disciplinary action, such as suspension, which implies the likelihood that at some future time the court may again be willing to hold out the embezzler as an officer of the court worthy of clients' trust. The appearance of a tolerant attitude toward known embezzlers would give the public grave cause for concern and undermine public confidence in the integrity of the profession and of the legal system whose functioning depends upon lawyers.

Other courts have reached a similar conclusion.[8] Thus, in *In the Matter of Wendell R. Wilson,* 81 N.J. 451, 453–55, 409 A.2d 1153, 1154 (1979), Chief Justice Wilentz, speaking for a unanimous court, pointed out that client trust is "built on centuries of honesty and faithfulness ... in

---

6. The factors were (1) the absence of commingling, since all of the client's funds were properly deposited in a trust account; (2) withdrawals to pay a small portion of legal fees undisputedly owed Addams by his client; (3) client authorization for Addams to use some of the funds in 1983 to pay overdue legal fees, and, based on her "supportiveness" of Addams at the hearing, the likelihood that she would have authorized the 1982 withdrawals had she been so requested; (4) the absence of harm to the client and complete client satisfaction with Addams' services; (5) misconduct limited to a single set of facts concerning a single client; and (6) Addams' practice of law for twenty-two years without disciplinary violations.

7. To the extent that these four members of the Board relied on *In re Cefaratti,* M–140–82 (D.C.

June 28, 1983), their reliance was misplaced. *See Buckley, supra,* 535 A.2d at 867.

8. This view of the relationship between an attorney and the client is hardly new. More than a century ago it was stated:

> The greatest trust between man and man is the trust of giving counsel. For in other confidences, men commit their parts of life; their lands, their goods, their children, their credit, some particular affair; but to such as they make their counsellors, they commit the whole; by how much the whole they are obligation to all faith and integrity.

Note, *Attorneys' Trust Accounts: The Bar's Role in the Preservation of Client Property,* 49 Ohio St.L.J. 275 (1988), quoting F. Bacon, *Of Counsel in The Works of Lord Bacon* 277 (1846). (Hereinafter *Note: Attorney's Trust Accounts* ).

the legal profession, the bar as an institution," and that abuse of this trust has "always been recognized as particularly reprehensible." *Id.*, 409 A.2d at 1154–55. Noting that the sanctions have varied because of the presence of mitigating circumstances, Chief Judge Wilentz wrote:

> It is therefore important that we reemphasize that the principal reason for discipline is to preserve the confidence of the public in the integrity and trustworthiness of lawyers in general.
>
> \*   \*   \*   \*   \*   \*
>
> There is nothing clearer to the public ... than stealing a client's money and nothing worse.   Nor is there anything that affects public confidence more—much more than the offense itself—than this Court's treatment of such offenses.   Arguments for lenient discipline overlook this effect as well as the overriding importance of maintaining that confidence.

*Id.*[9]

The highest court in Maryland has long been in agreement, stating in *Attorney Grievance Comm'n of Maryland v. Cockrell*, 304 Md. 379, 393–94, 499 A.2d 928, 935 (1985), that "when an attorney is found to have betrayed the highest trust imposed in him by appropriating to his own use funds of others entrusted to him, then, absent the most compelling extenuating circumstances, disbarment should follow as a matter of course."   Citing *Attorney Griev. Comm'n v. Velasquez*, 301 Md. 450, 457–59, 483 A.2d 354, 358 (1984) (disbarment ordered for misappropriation of clients' escrow account, as assets of clients are "a sacred trust") (noting cases going back to 1941).   The New Hampshire Supreme Court has adopted a rule like our own, *see Carroll's Case*, 127 N.H. 390, 393, 503 A.2d 750, 751 (1985) ("[o]rdinarily, the misuse of a client's funds justifies disbarment"), emphasizing that "the opportunities and duties of our profession flow from the willingness of clients to trust us with what they value," and thus, "[a] lawyer's obligation to refrain, at the least, from misuse of a client's property must therefore stand among the most insistent of professional norms."   *Connolly's Case*, 127 N.H. 786, 790, 508 A.2d 1054, 1057 (1986).   *See also People v. Radosevich*, 783 P.2d 841, 842 (Colo.1989) (en banc) ("conversion of client funds destroys trust essential to the attorney-client relationship, severely damages the public's perception of attorneys and erodes public confidence in our legal system").

This court, sitting en banc, made clear in *In the Matter of Burka*, 423 A.2d 181 (D.C.1980), that disbarment would be the sanction for intentional misappropriation. The court rejected the suggestion that alleged mitigating factors should cause the court to reject the Board's recommendation of disbarment, as a result of unauthorized withdrawals from an estate account and commingling, of an attorney who had practiced law for twenty-one years without disciplinary infraction; corrupt intent was not a factor in the court's conclusion about sanction.   423 A.2d at 182 n. 1.   At the same time this court, like others, has recognized that a *per se* rule would be inequitable since there may be circumstances in which disbarment will not be the appropriate discipline for intentional misappropriation of client funds.[10]   Along with other

---

**9.** In *In re Harrison*, 461 A.2d 1034, 1036 (D.C. 1983), the court adopted the definition of misappropriation used in New Jersey, noting that it was consistent with the language of our DR 9–102, which does not require scienter. Thus, misappropriation is "any unauthorized use of client's funds entrusted to him [or her], including not only stealing but also unauthorized temporary use for the lawyer's own purpose, whether or not he [or she] derives any personal gain or benefit therefrom."   461 A.2d at 1036 (quoting *Wilson, supra*, 81 N.J. at 455 n. 1, 409 A.2d at 1155 n. 1).   "This definition makes clear that improper intent is not an element to be considered in determining whether there had been a misappropriation."   *Id.*

**10.** *See* ABA Standards for Lawyer Discipline and Disability Proceedings Standard 7.1 (courts should avoid adoption of rules that mandate dispositions for certain forms of misconduct since fixed penalties limit ability to address complexity and variety of circumstances in each case).   *See Disciplinary Counsel v. Kanuck*, 517 Pa. 160, 535 A.2d 69, 76 (1987); *Disciplinary Counsel v. Lucarini*, 504 Pa. 271, 472 A.2d 186, 190 (1983); *In re Bardford*, 550 N.Y.S.2d 61 (A.D. 3 Dept.1989); *Delk v. Virginia State Bar*, 233 Va. 187, 355 S.E.2d 558 (1987).

jurisdictions, the court has viewed chronic alcoholism as such a circumstance. *In re Kersey, supra,* 520 A.2d at 321.[11] *See also Attorney Griev. Comm'n v. Nisbett,* 316 Md. 464, 560 A.2d 18 (1989); *Waysman v. State Bar,* 41 Cal.3d 452, 459, 714 P.2d 1239, 1244, 224 Cal.Rptr. 101, 105 (1986); *In re Johnson,* 322 N.W.2d 616, 618 (Minn. 1982); *In re Kumbera,* 91 Wash.2d 401, 405–07, 588 P.2d 1167, 1170 (1979). *Committee on Professional Ethics and Conduct of the Iowa State Bar Association v. Brodsky,* 318 N.W.2d 180 (Iowa 1982) (indefinite suspension with right to reapply after three years for isolated incident of dishonest conduct where attorney, who had spotless record for over eighteen years, used client's property as his own and presented untruthful defense to grievance commission). *Compare In re Pekor,* 257 Ga. 800, 364 S.E.2d 578 (1988) (in light of history of alcoholism two-year suspension and completion of treatment appropriate for attorney who obtained controlled substances by means of fraud and misappropriation), *with Office of Disciplinary Counsel v. Silva,* 63 Haw. 585, 595, 633 P.2d 538, 545 (1981) (attorney disbarred for misappropriation of client funds in light of *lack* of showing progress in alcoholism treatment). There may well be other circumstances involving a member of the Bar that will cause the court to reach a similar

conclusion.[12] We have no occasion to define those circumstances here other than to reaffirm that it is appropriate for the court to consider the surrounding circumstances regarding the misconduct and to evaluate whether the mitigating factors are highly significant and, where there are aggravating factors, they substantially outweigh any aggravating factors such that the presumption of disbarment is rebutted. The circumstances are likely to be limited, however, and our statement in *In re Hines,* 482 A.2d 378, 386 (D.C.1984) ("There may be instances of misappropriation which, for any number of reasons, may call for a lesser sanction") should not be read too broadly. In all events, it must be clear that giving effect to mitigating circumstances is consistent with protection of the public and preservation of public confidence in the legal profession.

The court noted in *Hines, supra,* 482 A.2d at 384 & n. 19, that of the twenty-eight cases coming to the court since the establishment of the present disciplinary system in 1972, although disbarment has been the usual sanction for commingling, eight had not resulted in disbarment, and in many such cases in which disbarment was recommended, there were additional factors, such as a prior disciplinary record, repeated instances of misconduct, or violations of other disciplinary rules.[13] In 1984

---

**11.** Kersey was charged with 24 violations of the Code of Responsibility, including two for misappropriation of client funds and one for commingling, occurring over a two-year period. The court found that Kersey's professional conduct was "substantially affected" by his alcoholism and held that rehabilitation efforts were a "significant factor" in determining the appropriate sanction for the widespread and persistent pattern of violations. *Id.* at 327. The court stayed execution of disbarment and placed Kersey on probation for five years subject to several conditions. *Id.* at 328.

**12.** For example, the Supreme Court of California has had occasion to consider the effect of attorney incapacity arising from extensive professional and personal problems. Acknowledging that "personal problems may legitimately explain a period of inattention to an attorney's law practice," the court, in a case of multiple and devastating personal and professional tragedies, resulting in severe depression for a time, placed an attorney on probation for five years when the usual sanction would have been

disbarment. *Silva–Vidor v. State Bar of California,* 49 Cal.3d 1071, 264 Cal.Rptr. 439, 443, 782 P.2d 680, 684 (1989) (en banc). Such empathy has its limits, however. The Supreme Court of California declined to forego disbarment where an attorney suffered from personal and professional problems but failed to acknowledge the impropriety of his conduct or to cooperate with the state bar investigation or to demonstrate sufficient commitment to rehabilitation for alcohol and drug abuse problems. *Walker v. State Bar of California,* 49 Cal.3d 1107, 264 Cal.Rptr. 825, 832–33, 783 P.2d 184, 191–92 (1989) (en banc). *See also In re Sullivan,* 530 A.2d 1115, 1119 n. 5 (Del.1987) (mental incompetency as a mitigating factor where attorney misappropriated client funds). Addams does not claim any mental or other disability, and none was found by the Board.

**13.** *Compare In re Burton,* 472 A.2d 831, 848 (D.C.), *cert. denied,* 469 U.S. 1071, 105 S.Ct. 563, 83 L.Ed.2d 504 (1984) (disbarment for commingling and misappropriation in two separate

the Board on Professional Responsibility expressly urged this court to adopt a rule that "misappropriation of client funds in cases involving more than simple negligence would ordinarily result in disbarment even though the proof does not rise to the level of willful corruption." *In re Hines, supra,* 482 A.2d at 386 (quoting the report of the Board on Professional Responsibility). In *Hines* the court put the Bar on notice that henceforth disbarment would be the usual sanction for misappropriation not involving simple negligence. *Id.* at 386–87. Before and since then this court has repeatedly emphasized both the seriousness of the misuse of client funds as well as the need to maintain if not enhance public confidence in the Bar. *See* notes 15 & 16, *infra.* Most recently, the court has adopted new rules of professional conduct, to be effective January 1, 1991, which continue to impose upon an attorney fiduciary obligations in holding the property of others.[14] The District of Columbia Bar contributes members' dues to the Client Security Fund precisely so that clients whose attorneys break their faith with the client can receive some recompense. *See* D.C.Bar Rule XII, § 1.

*Buckley* was the first occasion after *Hines* in which the court addressed the appropriate sanction for intentional misappropriation. The court viewed the result of disbarment to be required under prior rulings, 535 A.2d at 866,[15] and thus rejected the several mitigating factors cited there, see note 5, *supra,* as insufficient to outweigh the conscious and continuing nature of his misconduct. 535 A.2d at 866–67. Since *Buckley,* the court has taken into account various mitigating factors in determining an appropriate sanction where an attorney has improperly dealt with client funds, but to date none has sufficed to overcome the presumption of disbarment where intentional misappropriation involving more than simple negligence was involved.[16]

Thus, we have declined to join those jurisdictions which treat intentional misappropriation of client funds as it would any other disciplinary violation. Not only do we agree that public confidence would be irreparably shaken were we to relax our vigilance in such matters at this late date, but we find that the standards used by these jurisdictions endorse the notion of degrees of corruptness, something that

cases and lying to Auditor–Master in defense of misconduct), *with In re Cefaratti, supra,* No. M–140–82 at 6–7 (citing as a mitigating factor, before imposing suspension of a year and a day for misappropriation, absence of previous disciplinary violation in a career spanning thirty-four years). In *Hines,* the court's reference to disbarment as the normal sanction for "commingling," appears, in view of the court's later discussion, to refer to commingling *in the sense* that unintentional misappropriation (e.g., letting the balance fall below the trust fund component) may also have been involved in the disbarment cases, although it is not clear. 482 A.2d at 385–86. *See also In re Hessler,* 549 A.2d 700, 700–02 (D.C.1988).

**14.** Rule 1.15 (Safekeeping Property) and Comment [1], Rules of Professional Conduct, Order of the District of Columbia Court of Appeals, March 1, 1990, printed in Special Supplement of the *Bar Report,* February/March 1990.

**15.** The court cited *In re Burton, supra,* note 13, 472 A.2d 831; *In re Burka,* 423 A.2d 181 (D.C. 1980) (disbarment for commingling and misappropriation, as well as various other disciplinary violations); and *In re Quimby, supra,* 123

U.S.App.D.C. 273, 359 F.2d 257 (disbarment for intentionally misappropriating funds from estates of two clients because of failed investment). *See also In re Moore,* M–83–141 (D.C. App. June 10, 1983) (disbarment for intentional misappropriation of $25,000 and concealment involving a single client the Board finding no mitigating factors); *In re McClellan,* M–51–80 (D.C.App. Mar. 26, 1981) (disbarment for failure to disburse monies to client in three separate cases and failing to appear in scheduled proceedings in other cases); *In re McClean,* M–142–82 (D.C.App. Apr. 11, 1983) (disbarment for commingling, misappropriation, making false statement and presenting false evidence to Bar Counsel).

**16.** *See In re Schneider,* 553 A.2d 206, 211–12 (D.C.1989) (alteration of credit card receipts submitted by young associate to law firm for reimbursement in violation of DR 1–102(A)(4) (dishonesty), 30–day suspension); *In re Hessler,* 549 A.2d 700, 716 (D.C.1988) (commingling and misappropriation through simple negligence, by allowing attorney's operating account balance to fall below amount of client's funds in account, in violation of DR 9–103(A), six-month suspension).

seems alien to so basic a part of an attorney's obligation to the client.[17]

For example, the Louisiana Supreme Court has attempted to devise categories of sanctions based on the moral corruptness of the misconduct. *Louisiana State Bar Ass'n v. Hinrichs*, 486 So.2d 116, 122–23 (La.1986). In that case the attorney was unable to pay the client the amount due as a result of the settlement of a worker's compensation case because of payment of a personal debt. After eight months of effort by the client to recover, having retained new counsel, the attorney paid the $11,200 owed plus an additional $3,500 in damages. *Id.* at 119. Although the court found that there was clear and convincing evidence that Hinrichs "knew or should have known of the reckless gamble he took with the client's money," the court concluded that Hinrichs' misconduct warranted only a three-year suspension in view of Hinrichs' state of mind and other, presumably, mitigating factors. *Id.* at 123.[18] The court defined the issue as whether the attorney "is morally fit to continue in practice by evaluating his understanding of and dedication to the ethical precepts of his profession as well as his inner strength and resolve to adhere to them in the future." It viewed reimbursement prior to the filing of a disciplinary complaint or legal proceedings "as a reliable indicator of conscience and moral character." *Id.* at 120. It also viewed prompt compliance with the client's request to turn over property as similarly indicative of good character, and deemed the attorney's previous disciplinary record, cooperation in the disciplinary proceedings,

reputation among his peers and in the community, his age, health, and experience as factors to be taken into account. *Id. See also Louisiana State Bar Ass'n v. Perez*, 550 So.2d 188, 191 (La.1989) (attorney acting as notary public disbarred after withdrawing funds from account, in bad faith and through the use of fraudulent actions, and making no effort to repay account). *See Grievance Comm'n v. Walton*, 251 N.W.2d 762 (N.D.1977) (in view of unblemished record, character testimony, full restitution, little if any danger of repetition, attorney suspended for six months). We find more persuasive the New Jersey court's analysis of the insufficiency of mitigating factors, suggesting that restitution, whether before or after the disciplinary process begins, may be largely a matter of financial means and have little to do with an attorney's continued fitness to practice; that the absence of prior discipline cannot excuse an "offense against common honesty [that] should be clear even to the youngest [practitioner]"; and that neither cooperation with the disciplinary body (which is already required by the ethical rules) nor contrition is sufficient to put at risk "the continued confidence of the public in the integrity of the bar and the judiciary." *See Wilson, supra*, 409 A.2d at 1156–57. *Contra Hinrichs, supra*, 486 So.2d at 120.

Other jurisdictions, while adopting a less subjective test than Louisiana, nevertheless place insufficient emphasis, in our view, on maintenance of public confidence in the bar. *See In re Deragon*, 398 Mass. 127, 132–34, 495 N.E.2d 831, 834 (1986) (public

---

**17.** In *In re Iulo*, 115 N.J. 498, 559 A.2d 1349 (1989), the court noted that "The essence of *Wilson* is that the relative moral quality of the act, measured by these many circumstances that may surround both it and the attorney's state of mind, is irrelevant: it is the mere act of taking your client's money knowing that you have no authority to do so that requires disbarment." 115 N.J. at 502, 559 A.2d at 1351 (quoting *In re Noonan*, 102 N.J. 157, 159–60, 506 A.2d 722, 723 (1986)). *See also Matter of Spagnoli*, 115 N.J. 504, 559 A.2d 1352 (1989) (rejecting allegation of marital problems and substance abuse for lack of evidence and relying on attorney's pattern of accepting retainers and not representing the client, and his failure to cooperate with ethics committee, as grounds for disbarment).

**18.** The court relied on the following factors as indicating that the attorney was not morally unfit to practice law: (1) the attorney, although grossly negligent in his treatment of his client's funds, had not committed any other fraudulent acts in connection with the conversion; (2) while "the client was seriously injured in his day-to-day living and in his dealing with creditors," the attorney fully repaid the client, with damages, albeit it eight months later; (3) the attorney had practiced law for thirty-two years and while the subject of sixteen prior complaints, none had been for commingling or conversion of client funds. *Id.* at 123.

censure for misappropriation by endorsement of client's signature on checks without express authority and commingling since acts arose from weakness, not malevolence); *id.* at 133–34, 495 N.E.2d 831 (Wilkins, J. and Hennessey, C.J., dissenting) (modest discipline of public censure threatens public respect for the legal profession and will impair public confidence in the court's regulation of the bar, noting attorney's conduct was intentional and continued for more than a year until client complained, full restitution not made); *In re Holz*, 125 Ill.2d 546, 127 Ill.Dec. 736, 742, 533 N.E.2d 818, 824 (1988) (for commingling and conversion of client funds, three-year suspension conditioned on restitution in amount of excessive fee, in view of attorney's candor, character testimony, commencement of restitution, and fact that violations occurred 12 to 15 years earlier).

The Bar of the District of Columbia has had sufficient notice of the gravity with which the court views intentional misappropriation, and we decline to restrict application of the presumption in favor of the sanction of disbarment in intentional misappropriation cases to circumstances involving multiple clients over an extended period of time.[19] See note 15, *supra; Silva–Vidor v. State Bar of California, supra,* 264 Cal.Rptr. at 443, 782 P.2d at 684 (disbarment where large number of clients adversely affected over an extended period of time). Accordingly, in general, neither the usual mitigating factors, see note 4, *supra,* nor subsequent proper bookkeeping practices or client satisfaction can overcome the presumption that for "[t]his offense against common honesty," *Wilson, supra,* 81 N.J. at 460, 409 A.2d at 1157, disbarment will be the appropriate sanction. *See, e.g., Attorney Grievance Commission v. Cockrell,* 304 Md. 379, 389–93, 499 A.2d 928, 933–34 (1985) (rejecting economic instability of attorney's personal and professional life as a defense to change of use of escrow accounts for personal purposes);

*Fitzpatrick's Case,* 132 N.H. 211, 216–18, 566 A.2d 157, 161 (1989) (citing *Eshleman's Case,* 126 N.H. 1, 6, 489 A.2d 571, 574 (1985) (mitigating factors do not necessarily preclude disbarment)); *Connolly's Case, supra,* 508 A.2d at 1057–58 (factors such as attorney's cooperation in audit of trust accounts, ill health and pressures of work and illness and death among friends and relations more appropriate for consideration upon attorney's application for readmission to the bar). While we recognize that the sanction for intentional misappropriation of client funds will be harsh in comparison to sanctions for other disciplinary violations involving conduct some may view as roughly equivalent misconduct, *see, e.g., Reback, supra,* 513 A.2d at 226 (imposing six months suspension for filing falsely signed court documents and lying to client); *In re Hutchinson,* 534 A.2d 919 (D.C.1987) (en banc) (one-year suspension for lying to a federal law enforcement agency), our concern is that there not be an erosion of public confidence in the integrity of the bar. Simply put, where client funds are involved, a more stringent rule is appropriate.

> Having sought his advice and relying on his expertise, the client entrusts the lawyer with the transaction—including the handling of the client's funds. Whether it be a real estate closing, the establishment of a trust, the purchase of a business, the investment of funds, the receipt of proceeds of litigation, or any one of a multitude of other situations, it is commonplace that the work of lawyers involves possession of client's funds. That possession is sometimes expedient, occasionally simply customary, but usually essential. Whatever the need may be for the lawyer's handling of clients' money, the client permits it because he trusts the lawyer.

*Wilson, supra,* 409 A.2d at 1154. The breach of trust is so reprehensible, striking at the core of the attorney-client relation-

---

**19.** We reject as meritless Addams' contention that he should not be disbarred because his actions occurred prior to our decision in *In re Hines, supra,* 482 A.2d at 378. *See Burka, supra,* & note 15. *See Buckley, supra,* 535 A.2d at 867 (sanction imposed for a rule violation is a judgment of attorney's fitness to continue practicing law rather than a form of punishment and, hence, the sanctions imposed are not circumscribed by *ex post facto* restrictions).

ship, that the respondent must carry a very heavy burden in rebuttal.

Addams was entrusted by Ms. Jackson with the funds required to stave off the foreclosure of her home. He jeopardized her ability to do so when he took funds from the escrow account and tendered a check to the noteholder which was returned for insufficient funds. He took funds from the escrow account on more than one occasion. His actions were not the result of simple negligence but were, as he admits, intentional. In addition, he presented his client with an accounting that did not reveal the moneys that he had withdrawn from the escrow account in 1982. To make matters worse, he presented conflicting explanations of his actions to Bar Counsel, the Hearing Committee and the Board. That he promptly made good on the bounced check offers little reliable evidence of moral qualities since he knew he had no right to take the escrow money in the first place. His many years of practice makes suspect his claims of client authorization.

On the other hand we recognize, as did the Board, that this is not the usual case of intentional misappropriation. The client is not the complainant, but rather is fully satisfied with Addams' representation of her. Addams undertook to represent Ms. Jackson vigorously even though she was continually behind in paying his legal fees and reimbursing him for costs associated with the litigation. As a result of his efforts, Ms. Jackson did not lose her house and she was relieved of liability to the noteholder when the note was declared null and void. All of this is commendable. In addition, Addams had practiced law for twenty-two years without disciplinary action. Furthermore, unlike the misconduct involved in many instances of misappropriation, Addams' misconduct was not aggravated by commingling.

It also is understandable that Addams wanted to be paid for his work and reimbursed for his expenses. He was entitled to this and he had the right to look to Ms. Jackson and to insist on prompt payment. He also had the right to pursue legal remedies against her, such as filing a lien. But he did not have, and he knew he did not have, the right to take money from the escrow account without her permission.

In one sense this is an unusual case, but in another sense it is all too usual.[20] The court cannot countenance a rule that would permit attorneys to misappropriate their legal fees from their clients while winning their cases and then cover-up the fact from their clients. That, and no less, would be the result were we to hold that the mitigating factors here were sufficient to rebut the presumption that Addams should be disbarred. While the complainant was the disgruntled third-party noteholder and not Addams' client, that circumstance offers no solace when the purpose of the severe sanction is to maintain public confidence in the bar. Indeed, the aggravating factors— Addams' dishonesty in presenting a false accounting and conflicting explanations for his conduct—compel the conclusion that Addams did not meet his burden to demonstrate that the presumption should not apply. He knowingly used his client's money as if it were his own, and it would be extraordinary, particularly in view of the long-announced presumptive rule in this jurisdiction. *In re Quimby, supra,* 123 U.S.App.D.C. at 274, 359 F.2d at 258, for the court to apply to a lesser standard to Addams' knowing and intentional misuse of his client funds, on more than one occasion, and his attempt to hide his actions from his client, and thus, abruptly abandon or relax that rule in favor of a less rigorous standard.

Accordingly, it is

ORDERED that Addams shall be disbarred from the practice of law effective thirty days from the date of this opinion.[21]

*So ordered.*

---

20. *See Note, Attorneys' Trust Accounts, supra* note 8, at 275 (ethical violations involving the mishandling of client funds are common). *See also In re Hines, supra,* 482 A.2d at 384 n. 19.

21. On September 26, 1989, the court granted petitioner's motion for a stay pending the filing and disposition of his petition for rehearing en banc.

FERREN, Associate Judge, concurring in the result:

I concur in the result of the court's opinion disbarring respondent, but my analysis differs. I agree with the majority that a presumption of disbarment applies to intentional misappropriation cases and that, after all the mitigating and aggravating factors are evaluated in this case, respondent has failed to overcome that presumption. I write separately, however, for two reasons. First, I differ both with the majority and with Judge Schwelb about the implications of *In re Hines*, 482 A.2d 378 (D.C.1984). Unlike the majority, I believe *Hines* announced a prospective rule; unlike Judge Schwelb, I believe the new *Hines* rule does not apply to the facts of this case. Second, I believe that, despite disclaimers to the contrary, the majority has effectively adopted a *per se* disbarment rule that will inevitably lead to inequitable results. Both Judge Schwelb, in dissent, and the Board on Professional Responsibility, in its post-argument submission, make a number of valid points about the use of mitigating factors in determining the appropriate sanction in misappropriation cases. I would adopt their approaches to mitigation as applied to a presumption of disbarment.

## I.

I agree with the majority that disbarment has been the normal sanction in this jurisdiction for intentional misappropriation of client funds—without regard to whether the intent was "corrupt" or "non-corrupt" —at least since *In re Burka*, 423 A.2d 181 (D.C.1980) (en banc).[1] See *ante* at 194. If, by the time of *Burka*, there was already a presumption of disbarment in all intentional misappropriation cases, the question arises: what was the significance of our later announcement in *Hines* that "from this moment on, in disciplinary cases in-

volving attorneys who misappropriate their clients' funds, disbarment will be the norm unless it appears that the conduct resulted from nothing more than simple negligence"? 482 A.2d at 386–87. While the majority is correct when it states, as a general proposition, that sanctions in a disciplinary case are not circumscribed by *ex post facto* restriction, see *ante* at 198 n. 19, I cannot accept the majority's implication that *Hines* did not announce a prospective rule. If that were true, there would be no plausible explanation for the fact that Hines himself was suspended for two years rather than disbarred. I believe the question is not whether *Hines* announced a new rule; rather, the question is: to what new category of misappropriation cases did *Hines* extend the presumption of disbarment?

The court in *Hines* quoted a recommendation from the Board on Professional Responsibility as follows:

> [T]he District of Columbia Court of Appeals has not yet ruled that misappropriation *of the sort engaged in in this case* will ordinarily result in disbarment. We think that *such conduct* should result in disbarment, but only after the bar has been put on notice by the District of Columbia Court of Appeals that misappropriation of client funds in cases *involving more than simple negligence* will ordinarily result in disbarment even though the proof does not rise to the level of willful corruption.

482 A.2d at 386 (emphasis added). As the emphasized language indicates, the Board's request, and the court's response, addressed "misappropriation of the sort engaged in in" *Hines*. The Board in *Hines* characterized Hines' misconduct as neither negligent nor intentional; rather it found that his behavior showed a " 'reckless disregard' for the status of the accounts in which he deposited his clients' money."

---

1. The respondent in *Burka* made an unspecified number of deposits (totalling $29,446) from unidentified sources into the estate checking account at issue, in addition to 15 unauthorized withdrawals (totalling $41,000) from the same account. 423 A.2d at 182. On those facts, Burka would have had at least a colorable argument that he intended to replace the funds he

misappropriated and, therefore, that his intent was "non-corrupt." The absence in *Burka* of any discussion of the corruptness of Burka's intent indicates that, by that time, disbarment had become the presumptive sanction in this jurisdiction for all intentional misappropriation, without regard to whether the intent was "corrupt" or "non-corrupt."

482 A.2d at 380. The concept of "reckless" as a level of intent between negligent and intentional is a familiar one in the law. The Board in *Hines* found the misappropriation reckless and sought a prospective pronouncement from this court that, from that moment on, "misappropriation of clients funds involving more than simple negligence"—*i.e.*, reckless misappropriation as well as intentional misappropriation—would ordinarily result in disbarment. Thus, in my view, *Hines* indeed announced a new rule of presumptive disbarment, but the rule was new only for reckless misappropriation cases, not, as Judge Schwelb believes, see *post* at 206, for intentional misappropriation cases as we have here[2] and as we had in *In re Buckley*, 535 A.2d 863 (D.C.1987).

## II.

I turn to mitigation. I subscribe to the majority's basic thesis that misappropriation cases are different from other disciplinary cases and therefore call for "a more stringent rule." See *ante* at 198. On the other hand, as the majority states, "this court, like others, has recognized that a *per se* rule would be inequitable since there may be circumstances in which disbarment will not be the appropriate discipline for intentional misappropriation of client funds." *Ante* at 194. I believe that the majority, by excluding certain potential mitigating factors from the equation and by making the presumption of disbarment unusually difficult to rebut, has gone beyond the rule we announced in *Hines* and effectively created a *per se* rule.

The majority today rejects, as did the majority in *Buckley*, the notion that the degree of corruptness is a factor to be considered in assessing the appropriate sanction in a misappropriation case. My colleagues state that "the notion of de-

grees of corruptness ... seems alien to so basic a part of an attorney's obligation to the client." *Ante* at 197. While it is clear that the lack of a "corrupt" intent is no defense to a charge of misappropriation[3] and that there is no exception to the presumption of disbarment for cases of "noncorrupt" intent, these premises do not necessarily lead to the conclusion that lack of corruptness should not even be considered as a mitigating factor in determining the appropriate sanction. I agree with Judge Schwelb's criticism of the majority on this point. See *post* at 204–205. Nothing in the majority opinion convinces me that we should be unable even to consider whether a sanction less than disbarment might be appropriate, for instance, in the case of a lawyer who has no intent to deprive a client of funds and who, accordingly, replaces misappropriated funds one day or one hour after the misappropriation occurs.

Moreover, I agree with Judge Schwelb that, given the importance we generally place on the lack of a prior disciplinary record in determining appropriate disciplinary sanctions, *see, e.g., In re Reback*, 513 A.2d 226, 233 (D.C.1986) (en banc), it makes no sense to say that such a consideration is irrelevant in misappropriation cases. Although the majority does not explicitly state that a lawyer's prior disciplinary record is irrelevant in these cases, my colleagues effectively make prior disciplinary record and virtually every other usual mitigating factor irrelevant when they establish the following standard: "[T]he mitigating factors of the usual sort, *see, e.g., In re Reback*, 513 A.2d 226, 233 (D.C.1986) (en banc), will suffice to overcome the presumption of disbarment only if they are *especially strong* and, where there are aggravating factors, they *substantially outweigh* any aggravating factors as well." *Ante* at 191 (emphasis added). The majori-

---

**2.** As mentioned in the division opinion in this case, the Board explicitly rejected the Hearing Committee's finding that respondent's action showed only "reckless disregard" and found that respondent's misappropriation was intentional. 563 A.2d 338, 341 n. 9 (D.C.1989).

**3.** *See In re Harrison*, 461 A.2d 1034, 1036 (D.C. 1983) ("misappropriation is 'any unauthorized

use of client's funds entrusted to [the lawyer], including not only stealing but also unauthorized temporary use for the lawyer's own purpose, whether or not he [or she] derives any personal gain or benefit therefrom'") (quoting *In re Wilson*, 81 N.J. 451, 455 n. 1, 409 A.2d 1153, 1155 n. 1 (1979)).

ty has thus gone beyond a mere presumption of disbarment and well beyond our statement in *Hines;*[4] the court today creates a presumption that is, realistically, virtually non-rebuttable.[5]

The majority's approach is particularly anomalous in light of the post-argument submission we have received from the Board.[6] That submission makes a strong case in favor of allowing full consideration of the usual mitigating factors in order to retain some flexibility in the system and to avoid the rigidity of a *per se* rule:

> The Board does not believe that disbarment should automatically be imposed in all intentional misappropriation cases. In determining the appropriate sanction in intentional misappropriation cases, the Court should not preclude consideration of mitigating factors. *See In re Reback,* 513 A.2d 226, 231 (D.C.1986) (en banc); *In re Haupt,* 422 A.2d 768, 771 (D.C. 1980); *In re Smith,* 403 A.2d 296, 303 (D.C.1979).

> The use of mandatory sanction or so-called *"per se* rules" should be avoided in the disciplinary system. Using *per se* rules leads to the perception that disci-

pline is imposed in a mechanistic or even arbitrary manner. Although predictability may be fostered by *per se* rules, this benefit is offset by a real risk of injustice when the individual circumstances of a case cannot be taken into account in imposing sanctions. This is especially so when the *per se* rule leaves no choice but to impose the ultimate sanction of disbarment.

> It is often said that "hard cases make bad law." The Board has seen evidence that, because of a perception that a determination of intentional misappropriation mandates disbarment, hearing committees may have tried to fashion their fact-findings in order to avoid this result.[7] Evasive action of this type is, of course, the response to be expected from tribunals bound by rules that are felt to be Draconian when applied to a "hard" case. *Per se* rules and the resulting evasive actions are likely to lead to the issuance of *sui generis* precedents that cannot logically be reconciled. If this happens, the credibility of the disciplinary system would be undermined.[8]

---

**4.** In *Hines* we stated:
   [W]e take this occasion to notify the bar that in future misappropriation cases disbarment will ordinarily be the sanction imposed by this court. We stress the word "ordinarily," for every case must turn on its own particular facts. There may be instances of misappropriation which, for any number of reasons, may call for a lesser sanction.
   482 A.2d at 386. The majority essentially acknowledges that the presumption of disbarment imposed today is tougher to rebut than the presumption described in *Hines* when the majority announces, among other things, that the above statement in *Hines* "should not be read too broadly." *Ante* at 195.

**5.** The majority's approach, however, does allow for an exception to the rule when an attorney's misconduct is found to be causally related to some sort of disability. *See ante* at 191, 194–195 & n. 12; *In re Kersey,* 520 A.2d 321 (D.C. 1987).

**6.** This submission apparently represents the views of all members of the Board except one who recused himself.

**7.** Indeed, it is possible that *Buckley* was an example of factfinding that was skewed in an attempt to avoid a perceived unjust result. In *Buckley,* the attorney misappropriated all but

$12 of a $5,288 fund that was to go either to the client or to pay the client's medical bills. 535 A.2d at 865. During a period of uncertainty as to whether Medicare would pay the client's medical bills, the attorney used the funds for his own personal and professional expenses. *Id.* It was not until a month *after* the client's wife filed a complaint with Bar Counsel that the attorney replaced the funds and properly distributed them. *Id.* Although there appears to be nothing in these facts to suggest that the attorney had any intention to return the funds before the complaint was filed against him, the Hearing Committee found that there was "no corrupt intention to convert the client's funds." *Id.* I cannot help wondering whether the same finding would have been made under a system with less rigidity in determining sanctions.

**8.** In its submission, the Board goes on to suggest that "[t]o the extent some recent disciplinary decisions of the Court and the Board may be read as implying that stricter sanctions are to be imposed in all 'money' cases, this erroneous perception should be eliminated." I believe that to adopt the Board's suggestion on this point would send out the wrong signal to the legal community and to the general public, in light of our previous statements in *Hines* and other cases. Nonetheless, I think the Board's submission should give the court considerable pause in

In the Board's concluding paragraph it states that "in all dishonesty cases, because of the infinite array of fact-patterns that can present themselves, some flexibility as to mitigation of sanction must be allowed—even if a degree of subjectivity is thereby injected into the process." I agree.

Apparently, every judge on this court, as well as every member of the Board, believes a *per se* disbarment rule would be inequitable and unworkable. I am therefore puzzled as to why the majority, while ostensibly eschewing a *per se* rule, has chosen to make the presumption of disbarment in misappropriation cases so strong that it will effectively eliminate the discretion, on the part of the Board and the court, necessary to deal fairly with the facts of each case. The majority's standard will inevitably lead to the very inequities we all seek to avoid. I believe that in determining the sanction in a non-negligent misappropriation case, we should begin with a presumption of disbarment and then evaluate and apply all mitigating and aggravating factors as we would in any other disciplinary case.

### III.

Applying the standard I propose, I believe respondent should be disbarred. Respondent's twenty-two years of legal practice without disciplinary action, his client's satisfaction with his representation, and the fact that his client owed him fees substantially in excess of the amount he misappropriated are all factors to be weighed in mitigation. The third factor should not, in my view, be given much weight, however, for two reasons. First, respondent should have known that the proper course of action was to assert a retaining lien on

the escrowed funds. *See Hines,* 482 A.2d at 380 n. 7. Second, despite respondent's claim of right, there is no evidence on this record that respondent actually credited his client's legal fee account at the time he converted the escrowed funds to his own use. Turning to the aggravating factors, I believe the fact that respondent gave a false accounting to his client and made several false explanations to Bar Counsel, to the Hearing Committee, and to the Board weigh heavily against him and overwhelm the mitigating factors present here. This is essentially a case of intentional misappropriation with a few mitigating factors, aggravated by an attempted cover-up; it is not simply a first offense, "noncorrupt" intentional misappropriation case. Accordingly, despite my difference of opinion as to the general significance of mitigating factors in misappropriation cases, I concur with the result reached by the majority in this case. Respondent should be disbarred.

SCHWELB, Associate Judge, dissenting:

Although this is obviously a close case—one-sided ones do not come to us with four members of the Board on Professional Responsibility having concluded that a lawyer should be disbarred and with four others having voted for suspension—I am of the opinion that disbarment is too harsh a sanction on these particular facts. I reach that conclusion largely for the reasons stated by Charles Donnenfeld, Esq. in the opinion which reflects his own views and the views of three other members of the Board. A copy of that opinion is attached hereto and, subject to a single caveat,[1] it is incorporated into this dissenting opinion by reference.

going beyond our announcement in *Hines,* as the majority has chosen to do.

1. Mr. Donnenfeld states in his opinion, *infra* at p. 211, that "we see no aggravating circumstances in this case." He also recognizes, on the same page, that "an inaccurate accounting as to those funds was presented to the client." I would regard Addams' attempt to cover up his wrongdoing by this false accounting as a substantial aggravating factor, even though human

nature is such that many trapped miscreants reflexively react in this manner. *See,* pp. 209–210, *infra. But see In re Buckley,* 535 A.2d 863, 866 (D.C.1987) (attorney ordered disbarred despite his "candid manner with respect to detailing his various actions"). Although the deception of the client occurred well after the misappropriation which Addams was attempting to conceal, Mr. Donnenfeld appears to have treated it as an integral part of Addams' violation, rather than as an aggravating factor.

Members of the Board are bound by prior decisions of this court. When we sit *en banc*, we are not. *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C.1971). I therefore think it appropriate to do what Mr. Donnenfeld and his colleagues were in no position to do, namely, to criticize some of our precedents. In my opinion, the court *en banc* should overrule in part or modify at least *In re Buckley*, 535 A.2d 863 (D.C.1987).

I

THE BUCKLEY DECISION

The four members of the Board who recommended disbarment relied heavily on this court's 2:1 decision in *Buckley*. Chief Judge Rogers has assembled an imposing array of authorities—many of them involving far more extensive wrongdoing than that here presented—in support of the position that Addams should be disbarred, but she too relies significantly on *Buckley*. Whether or not disbarment of the respondent in *Buckley* was appropriate—and, like Judge Mack, who dissented, I have some reservations on that score—I think that we should reject at least some of the language in the *Buckley* opinion.

A. *Equating the inequatable: corrupt intent makes a difference.*

In *Buckley*, the majority rejected as "rather imprecise and unhelpful" the Board's view that it was proper, for purposes of determining what discipline should be imposed, to differentiate between "corrupt" and "non-corrupt" misappropriations. 535 A.2d at 866. Citing *In re Harrison*, 461 A.2d 1034, 1036 (D.C.1983), the court effectively held that there was no difference for purposes of sanction between a lawyer's temporary use of his client's funds on the one hand and outright theft on the other. *Id.* This apparently means that a lawyer who, awaiting receipt of a government check on Tuesday, borrows $100 on Monday from a client's account and returns that sum on Tuesday, should

be subject to the same sanction as a practitioner who steals $50,000, spends it to support an extravagant lifestyle, and thereafter covers his tracks.

The basic purpose of disciplinary proceedings is to protect the public, the courts, and the legal profession from the depredations of unethical practitioners. *See, e.g., In re Haupt*, 422 A.2d 768, 771 (D.C.1980).[2] Sanctions are also designed to deter other attorneys from engaging in similar misconduct. *In re Reback*, 513 A.2d 226, 231 (D.C.1986) (*en banc*). Even temporary misappropriation of a client's funds is a very serious matter, but it surely cannot be gainsaid that the public needs greater protection from the corrupt thief than from the non-corrupt but culpable cutter of corners who never intended to steal. That is why, in selecting the proper sanction for other violations of the Code of Professional Conduct, we have found the presence or absence of a fraudulent intent or state of mind to be so important. *See, e.g., In re Hutchinson*, 518 A.2d 995, 1000 (D.C.1986).

"Our purpose in imposing discipline is not to visit punishment upon an attorney." *In re Kersey*, 520 A.2d 321, 327 (D.C.1987); *In re Hutchinson*, 518 A.2d 995, 1000 (1986). Nevertheless, in determining what sanction is appropriate, we must consider "the moral fitness of the attorney, to the extent that we can discern it." *Hutchinson, supra*, 518 A.2d at 1000. Although the unauthorized short-time borrower who intends to return what he borrowed is no paragon of virtue, the moral gravity of his conduct obviously pales in comparison to the wickedness intrinsic in outright theft from a client who has placed his trust in his treacherous attorney.

The majority in *Buckley* probably did not mean to suggest that temporary and non-corrupt misappropriation is just as bad as its permanent and corrupt counterpart. It did hold, however, that the former ought to be punished just as harshly as the latter; that taking property without right will incur the same consequences as grand larce-

2. *Cf. In re Wilson*, 81 N.J. 451, 456, 409 A.2d 1153, 1155 (1979) ("the principal reason for discipline is to preserve the confidence of the public in the integrity and trustworthiness of lawyers in general").

ny. I cannot agree that violations so lacking in moral equivalence may properly be treated as one and the same. I have no problem with applying a rebuttable presumption of disbarment even in a "temporary borrowing" case, but I think that the presence or absence of an intent to steal is an important factor in determining whether the presumption has been rebutted.[3]

### B. The spotless record as irrelevant: rigor selectively applied.

In *Buckley,* the court also effectively held that, even in "non-corrupt" misappropriation cases, conventional mitigating factors will not justify less severe discipline. The court acknowledged that the "ultimate harm suffered by [Buckley's] client was relatively slight," that Buckley had been cooperative and candid during the Board's investigation,[4] and that he had an "otherwise clean disciplinary record of thirty years." 535 A.2d at 866. *Buckley* being a misappropriation case, however, these circumstances were not viewed as providing support for a sanction less severe than disbarment.

In *In re Reback,* 513 A.2d 226 (D.C.1986) (*en banc*), the respondent attorneys, seeking to conceal from their client that her divorce complaint had been dismissed by the court because the attorneys had negligently failed to place it at issue, forged the client's signature on a new complaint, secured a notarization of the false signature, and filed a new complaint without advising the client. The client nevertheless learned of these events and discharged the attorneys. Disciplinary proceedings ensued. The Hearing Committee recommended "public censure" as the appropriate discipline. A majority of the Board proposed suspensions of a year and a day for the senior lawyer and thirty days for the less experienced one.[5] This court, sitting *en*

banc, ordered that each be suspended for six months. Apparently, the sanction of disbarment was not considered, in spite of the patently fraudulent character of the respondents' conduct. In concluding that suspension for as long a period as a year and a day was not necessary, this court cited respondents' contrition, their cooperation with the investigation, the fact that they had returned the client's fee, and the lack of any significant injury to the client. The court placed its greatest emphasis, however, on respondents' status as first offenders:

> Most important is the fact that both Reback and Parsons have had unblemished records of professional conduct during 30 and 15 years of practice, respectively. *This factor weighs heavily in favor of imposing upon them the lightest sanction that will serve the purposes of Bar discipline.*

*Id.* at 233 (emphasis added).

In my opinion, the respondents in *Reback* sullied the name of our profession, and more severe discipline might well have been in order. Nevertheless, if one views the case in the context of the purposes of the disciplinary process, the court was surely right in concluding that a respondent's prior record must be given significant consideration. I believe that this holds true generally, at least in those cases in which the underlying violation does not call for automatic disbarment. An attorney who commits a single violation which represents an isolated aberration from the norm of ethical professional conduct is far less likely to be a danger to the public, the court, or to the Bar than a colleague who has a significant record of prior misconduct. From the perspective of moral fitness, the recidivist is uniformly viewed as more culpable, more dangerous, and more

---

3. I recognize that many respondents may and do claim that they intended to return funds which they misappropriated. Whether such a claim is credible in a particular case is a determination to be made initially by the trier of fact, ordinarily the Hearing Committee.

4. Addams was not at all candid during the investigation of his violations, however. He can

therefore take no comfort from my view that the court in *Buckley* should have accorded more significance to the respondent's candor after the fact.

5. The junior respondent dealt with the client. The more experienced one took responsibility for the case.

deserving of severe sanctions than is the first offender.

It may be that an unblemished record, *standing alone*, ought not to preclude disbarment in a misappropriation case. Perhaps this should be true even where the misappropriation was "non-corrupt," although one might reasonably argue for a contrary result. But where, as here, there are significant case-specific mitigating factors, I think that basic fairness requires us to accord considerable weight to Addams' favorable prior record.[6]

### C. "From this moment on!"

In *In re Hines*, 482 A.2d 378 (D.C.1984) (*per curiam*), the Board on Professional Responsibility stated in its report that

> [T]he District of Columbia Court of Appeals has not yet ruled that misappropriation of the sort engaged in in this case will ordinarily result in disbarment. We think that such conduct should result in disbarment, *but only after the bar has been put on notice by the District of Columbia Court of Appeals* that misappropriation of client funds in cases involving more than simple negligence will ordinarily result in disbarment even though the proof does not rise to the level of willful corruption.

*Id.* at 386 (emphasis added). This court looked with favor on the Board's recommendation, and proclaimed, presumably without musical accompaniment, that

> *from this moment on*, in disciplinary cases involving attorneys who misappropriate their clients' funds, disbarment will be the norm unless it appears that the misconduct resulted from nothing more than simple negligence.

*Id.* at 386–87 (emphasis added). Although Hines had commingled the funds of two of his clients with his own money, and even though he was found to have engaged in conduct involving dishonesty, he was not disbarred. Rather, the court ordered that Hines be suspended for two years.

I think it obvious from the sanction which was ultimately imposed that the four underscored words from the popular song were included in the *Hines* opinion for a reason. "From this moment on," the Bar would be on notice of a new, tougher policy. Earlier cases, by necessary implication, would be governed by the previous and less draconian one. This is the only reasonable explanation for the outcome, for the respondent in *Hines* was suspended, not disbarred.

In *Buckley* (and in the present case as well) the violations predated the *Hines* decision. The court opined in *Buckley, supra*, 535 A.2d at 867, that "*Hines* did not announce a new rule with exclusive prospectivity," and ordered the respondent disbarred. The court also noted, correctly in my view, that "*Hines* created no right to be free of the risk of disbarment for misappropriation conduct preceding that decision." In my opinion, however, the majority opinion in *Buckley* "fudged" the proposition, unambiguously established by *Hines*, that sanctions for conduct occurring after the Bar was apprised of the *Hines* decision would be more severe than those previously imposed for like violations. A presumption of disbarment would apply prospectively to cases which were not previously subject to it. I think that the respondents in *Buckley* and in the present case were entitled under *Hines* to have their sanction determined under pre-*Hines* standards. I do not think that this occurred.[7]

---

**6.** For reasons discussed below at p. 208, I also believe that the lack of any significant injury to the client ought to be a significant factor in determining whether the presumption of disbarment has been rebutted.

**7.** I agree with the majority that the sanctions to be imposed for an attorney's dishonorable conduct are not circumscribed by *ex post facto* restrictions. *See* maj. op. at 198 n. 19. I simply suggest that retroactive application of a new rule which was designed to apply "from this

moment on" renders those words superfluous and changes the basic thrust of this portion of the *Hines* decision. The violations in *Buckley*, like those in *Hines*, predated the decision in *Hines*. The respondents in the two cases were similarly situated. The same standards ought to have been applied to them, and to Addams as well.

In his concurring opinion, ante at 200–201, Judge Ferren says that *Hines* announced a new rule only for "reckless misappropriation cases." I think he is cutting it too fine. As I read the

## II

## MITIGATION AND AGGRAVATION

My colleagues in the majority take the position that misappropriation cases differ from other proceedings, that putting a client's money to the attorney's own use is *sui generis*, and that mitigating factors such as lack of corrupt intent, an exemplary prior record, and the absence of meaningful injury to the client ought not to relieve the lawyer from disbarment. Besides *Buckley*, my colleagues rely largely on *In re Quimby*, 123 U.S.App.D.C. 273, 359 F.2d 257 (1966) (*per curiam*), and *In re Wilson*, 81 N.J. 451, 409 A.2d 1153 (1979), and also cite a number of other decisions. I have no quarrel with the sanction of disbarment on the facts of those cases, nor do I challenge the proposition that a lawyer's theft from his client is ordinarily so indefensible a betrayal of trust that the most serious consequences should follow. I believe, however, that the fact patterns in *Quimby*, *Wilson* and other cases cited differ substantially from the situation which obtains here, and that the sweeping language in some of these opinions does not fit this case.

Financially embarrassed as a result of an unsound investment in a personal business venture, Quimby withdrew a total of $18,-000 from the accounts of two incompetents, which accounts had been entrusted to him. He converted the money to his own use. The court concluded that Quimby's conduct constituted embezzlement and evidenced moral turpitude. It held that, under those circumstances, "disbarment should ordinarily follow as a matter of course," notwithstanding Quimby's "long and otherwise unstained record before the bar." *Quimby, supra*, 123 U.S.App.D.C. at 274, 359 F.2d at 258. The result evidently hinged on the court's assessment of the respondent's conduct as being characterized by moral turpitude. This differentiates the case from *Buckley* and from the present case. As I understand *Buckley* and the majority opinion here, a corrupt intent—the practical equivalent of moral turpitude—need not be shown.

In *Wilson*, the respondent attorney was the subject of numerous disciplinary complaints. Two of them involved misappropriation. In one case, the attorney had retained $23,000—the proceeds of the sale of a house—and failed for two years to turn the money over to his client.[8] In the second, he had forged his client's name on a $4300 check made to the client's order, deposited the proceeds in his own trust account, and never returned the money. He had also lied to clients and failed to cooperate in the ethics inquiry. In my opinion, no reasonable person could fail to conclude that disbarment was the appropriate remedy on these facts.

In a thoughtful and literate opinion by Chief Justice Willentz, however, the court in *Wilson* went well beyond the facts presented by the case at hand and attempted to fashion a rule of general application. The court discussed a number of possible mitigating circumstances which were often presented in disciplinary proceedings based on misappropriation of client funds,[9] and effectively rejected them all. The court concluded that

> recognition of the nature and gravity of the offense suggests only one result—disbarment. Such conduct is of so reprehensible a nature as to permit of only one form of discipline.

*Wilson, supra*, 81 N.J. at 455, 409 A.2d at 1155 (citation and internal quotation marks omitted). Some of the court's language

---

*Hines* opinion, the remedy of disbarment was to apply presumptively "from this moment on" in cases involving more than simple negligence "*even though the proof does not rise to the level of willful corruption.*" 482 A.2d at 386. (Emphasis added.) The court's stated focus was on the underscored language. In my view, the "prospective only" limitation to the applicability of the *Hines* presumption fits the present case.

8. Wilson ultimately paid the client after the ethics complaint was filed. He never accounted for the location or use of the funds in the interim.

9. *E.g.*, restitution after apprehension, an intent to "borrow" rather than to steal, the inexperience (or outstanding career) of the lawyer, the lawyer's financial problems, etc.

was quite sweeping,[10] although none, in my view, addressed the rather unique situation in the present case.

The *Quimby* and *Wilson* opinions ought not to be removed from their moorings. As this court explained, in *Kraft v. Kraft*, 155 A.2d 910, 913 (D.C.1959):

> It is well to remember that significance is given to broad and general statements of the law only by comparing the facts from which they arise with those facts to which they supposedly apply.

*Accord, Armour & Co. v. Wantock*, 323 U.S. 126, 132–33, 65 S.Ct. 165, 168, 89 L.Ed. 118 (1944); *see also Tydings v. Tydings*, 567 A.2d 886, 895 (D.C.1989) (concurring opinion).

The present case is strikingly different from *Quimby* and *Wilson* and, indeed, from all of the authorities on which the majority relies, because Addams' client owed him money,[11] had no objection to his taking it, and was still substantially indebted to him after Addams' deed was done. Addams' client was satisfied with his services, and would apparently have agreed to his withdrawal of the money if Addams had asked her. Indeed, she *did* agree to a withdrawal for similar purposes the following year.[12] Not only was the client delighted with Addams' representation,[13] but the

complaint against Addams was made by the apparently vengeful litigant whom Addams had defeated on the client's behalf. I find the six mitigating factors enumerated at pp. 211–212, *infra*, in the opinion of Mr. Donnenfeld quite compelling. Mr. Donnenfeld demonstrates that, although this was a case of misappropriation, it was an extraordinary one to which the "ordinary" sanction should not apply.

It is one thing to steal money from someone, leaving the victim impoverished. It is quite another to appropriate funds which are only a small portion of what the "victim" owes you, when the debt demains substantial even after the improper withdrawal and the evidence points to the conclusion that she[14] would have consented in any event.

In *Wilson, supra*, the court expressed concern, in ordering disbarment, about "the pressures on the attorney that forced him to steal." 81 N.J. at 460, 409 A.2d at 1157. The court suggested, however, that concern should be shown for the defalcating lawyer's victim, for

> the sympathy engendered by the plight of the attorney which caused him to steal is offset by the fact that he did so, most often, without regard to the possibility

---

**10.** The passage quoted in the text above suggests that the court intended to adopt a *per se* rule requiring disbarment in all misappropriation cases.

**11.** In *Hines,* the client also owed the respondent money for his services, but the circumstances were significantly different from those presented here. *See* the court's discussion of the issue, 482 A.2d at 380 & n. 7 & n. 8. In any event, there were violations by the respondent vis-a-vis several clients, there was no indication of client satisfaction, and Hines was suspended, not disbarred.

**12.** I agree, however, with the statement by the Board in the unanimous portion of its Report that
> it is not clear whether the funds belonged to [the client] or to the noteholder at the time of the misappropriation. In either event, Addams had no right to the money.

Even if the client's testimony were to be treated as a retroactive after-the-fact consent, the withdrawal would still have been improper.

It is worth noting, though, that the trust account in question consisted of money provided

to Addams by the client, albeit for the purpose of making any necessary payments to the noteholder, not to her attorney. To the extent that Addams knowingly took somebody else's money, he may well have viewed it as belonging to his client, the person from whom he got it and who owed him a much larger amount. In any event, there was no finding or proof that Addams thought he was converting the noteholder's money.

**13.** In *Reback, supra*, 513 A.2d at 232, this court placed considerable emphasis on the lack of harm suffered by the client as a result of the respondents' improper conduct. The court stated that "of course, if respondents' dishonesty had led to adverse consequences, even if temporary, or would have done so if undiscovered, that would put them at far greater risk of severe discipline." *Id.* at n. 6.

**14.** Admittedly, however, there is no indication that the noteholder, a potential claimant to the money, would have consented to the withdrawal.

that he might be inflicting the same misery, or worse, on his innocent client. *Id.* at 461 n. 6, 409 A.2d at 1157 n. 6. In the present case, Addams was not inflicting misery on his client. She never claimed that he was. When he had completed the misappropriation, she still owed him a lot of money and remained, to put it in the vernacular, well ahead of the game.

My colleagues in the majority quote *People v. Radosevich*, 783 P.2d 841, 842 (Colo. 1989) (*en banc*), for the proposition that conversion of client funds "destroys trust essential to the attorney-client relationship, severely damages the public's perception of attorneys, and erodes public confidence in our legal system." So it does. In the present case, however, the trust between lawyer and client was *not* destroyed. It appears that the client still trusted Addams at the time of the hearing, when all of the facts had been disclosed. To say that this case represents a kind of betrayal of trust which cases like *Radosevich* were designed to address seems to me to extract the rule of those cases from the context for which it was designed.[15]

It is true that Addams compounded his misappropriation by attempting to cover it up. He did so both by presenting a false accounting and by providing disingenuous and mutually contradictory explanations of his conduct during the disciplinary proceedings. Unfortunately, the instinct for self-preservation at any cost exerts so much pressure on a wrongdoer seeking to avoid discovery that considerations of reason and honor are often relegated to a subordinate role. Addams was not the first wrongdoer to try to conceal his misdeeds in less than forthright fashion in a vain effort to forestall exposure and disgrace. Human beings under pressure do not always act as nobly as they might on a calmer day when the sky is serene and they feel no all-en-

compassing apprehension of impending doom. But while judges can surely understand why he who has transgressed may lie when cornered, we cannot condone such conduct, especially on the part of those who have cast their lot with a noble and honorable profession and are bound to uphold its standards.

Unlike Mr. Donnenfeld and his colleagues, I am of the opinion that Addams substantially aggravated his initial violation when he was, to put it charitably, less than forthright in explaining it. Indeed, his attempted deception of his client with a false accounting and by concealment of his withdrawals has led me to pause for more than a moment before casting my dissenting vote. Deplorable as the cover-up was, however, to me it was not bad enough to convert this particular misappropriation into an offense warranting the disbarment of an attorney with a previously unblemished record. Rather, I believe that the mitigating factors which I have enumerated—Addams' clean record, the lack of significant injury to the client, and the money that the client owed him—substantially outweigh his human but culpable reaction to the discovery of his misdeed.

I might conclude otherwise if it were our uniform practice to deal sternly with dishonorable conduct on the part of members of an honorable profession. But recognizing that every case is unique, and that comparisons are especially difficult when different kinds of ethical violations are being placed under the scrutiny of the same judicial microscope, I am nevertheless of the opinion that Addams' disbarment is very harsh medicine when compared with the far less draconian sanctions imposed in other recent cases in which the attorney's conduct was at least as dishonorable. *See, e.g., Hutchinson, supra;*[16] *Reback, su-*

---

**15.** In *Radosevich,* the court quoted the American Bar Association's *Standards for Imposing Lawyer Sanctions* § 4.11 (1986):

> Disbarment is generally appropriate when a lawyer knowingly converts client property and *causes injury or potential injury to a client.*

783 P.2d at 842 (emphasis added). I question whether the italicized language fits the present case.

**16.** In *Hutchinson,* the respondent lied under oath to a federal administrative agency. The Board recommended that he be suspended from practice for a year. This court suspended him for six months. 518 A.2d at 1000–02.

*pra;*[17] *In re Sandground,* 542 A.2d 1242 (D.C.1988) *(per curiam);* [18] and *In re Kersey,* 520 A.2d 321 (D.C.1987).[19] I appreciate the majority's thesis that misappropriation cases are different, but I think that resort to that principle to disbar Addams for the particular misappropriation disclosed on this unusual record is disproportionate and, in the final analysis, lacking in fairness and balance.

I share the majority's concern that the public's trust in the legal profession could be eroded if we were unduly lenient in misappropriation cases. But given the client's satisfaction with Addams, the fact that on balance he did her so much more good than harm, and the source of the accusations against Addams—a defeated and apparently disgruntled adverse litigant—I do not believe that reasonable members of the public who were apprised of all of the relevant facts would have less confidence in the profession, or in this court's supervision of it, if Addams were suspended for some significant period rather than disbarred.

I respectfully dissent.

## DISTRICT OF COLUMBIA COURT OF APPEALS BOARD ON PROFESSIONAL RESPONSIBILITY

### Bar Docket No. 270–85

### SEPARATE OPINION OF MEMBERS COHEN, KEEP, KAISER AND DONNENFELD AS TO RECOMMENDED SANCTION

In its *Buckley* decision 535 A.2d 863 (D.C.1987), the Court reaffirmed its previous statement in *In re Hines,* 482 A.2d 378 (D.C.1984), that "disbarment will ordinarily be the sanction" in misappropriation cases. However, the Court went to pains to "reiterate" that "in the wake of *Hines* there is no *per se* rule regarding disbarment." The Members joining in this separate opinion feel that their colleagues, in urging disbarment, are applying *Buckley* in a *per se* manner and ignoring its instruction that we are to consider "extenuating or aggravat-

17. In *Reback,* as described above at pp. 205–206, the respondent attorneys forged their client's signature and secured notarization of the false signature. They also lied to their client. Each received a six month suspension.

18. In *Sandground,* the respondent knowingly assisted his client in the concealment of his assets in connection with a discovery request in a pending divorce suit. He did so, among other ways, by taking title in his own name to a home being purchased by his client. He wrote to his client that this would be "a secret transaction because of the matrimonial situation, and as soon as the divorce is final, the property will be transferred to you and all documents entered into will be destroyed." In spite of its finding that Sandground had engaged, *inter alia,* in conduct involving dishonesty, fraud, deceit or misrepresentation, the Hearing Committee recommended only that he be publicly censured. The Board recommended that he be suspended for ninety days. Bar Counsel proposed suspension for nine months. This Court adopted the recommendation of the Board.

19. In *Kersey,* the respondent committed a total of twenty-four violations over a two-year period. Three involved misappropriation of client funds, and there were several additional counts of commingling and of failure to maintain complete records of client funds. 520 A.2d at 324. The Board observed that "it is difficult to call to mind very many respondents who, in recent years, have been proven to have engaged in such a widespread and persistent pattern of violations of the ethics of our profession." *Id.* The Board perceived "a pattern of dishonesty and deceit so pervasive that disbarment was the only appropriate sanction." *Id.* at 323. Noting that alcoholism is a disease and that but for Kersey's alcoholism the misconduct would not have occurred, this court ordered Kersey disbarred but stayed the execution of the disbarment and placed Kersey on probation for five years. The effect of the stay was that the discipline imposed included no suspension from practice at all.

This case is not the occasion for a protracted debate over alcoholism as a mitigating factor in bar discipline cases. I agree that it is unconscionable to penalize someone for being ill. I suggest, on the other hand, that an alcoholic who is under an irresistible compulsion to drink is not thereby compelled to operate a motor vehicle, and his disease is no defense to a charge of drunken driving. A similar reality may apply to attorneys who suffer from the same affliction. The consequences to the victimized client are no less severe where the offending lawyer is an alcoholic, and the need to protect the public is just as compelling. In any event, from Addams' perspective, the discipline meted out to him and to Kersey may reasonably appear to represent less than equal justice. It may also present a counter-incentive to sobriety.

ing circumstances" before imposing sanction in misappropriation cases.

We feel that a fair consideration of the mitigating factors of the present case justifies a suspension of a year and a day, rather than disbarment. A suspension of a year and a day is justified, first, when measured by the general criteria for imposing discipline on lawyers, as articulated in *In re Reback and Parsons*, 513 A.2d 226 (D.C.1986) (*en banc*). The Court there noted that maintenance of the integrity of the profession, protection of the public and the courts, and deterrence were the principal factors to be considered in imposing discipline. *Id.* at 231. Mitigating and aggravating circumstances surrounding the misconduct, and the attorney's previous disciplinary record are also factors to be considered. *Id.*

Applying these criteria to this case, there is little question that funds of a client (or their legal equivalent) [1] were taken without contemporaneous authorization, and an inaccurate accounting as to those funds was presented to the client. These actions persuade us that the Respondent did not conduct himself at the level of integrity expected of members of the Bar, and that he should be required to demonstrate his fitness to practice law before being allowed to resume practice in the future. Because this case involves an attorney's handling of funds of a client, a role which attorneys are frequently called upon to perform and in which the public must have full confidence, protection of the public and deterrence are also disciplinary factors suggesting a lengthy suspension.

We see no aggravating circumstances in this case and, in mitigation, note the following:

1.  There was no commingling; all of the client's funds were properly deposited in a trust account.

2.  The withdrawals were made to pay a small portion of legal fees that were undisputedly owed to Respondent.

3.  Several months after the withdrawals were made, the client approved of Respondent's use of some of the trust funds to pay overdue legal fees; based on her supportiveness of Respondent expressed at the hearing, the client would likely have authorized the withdrawals at the time they occurred had she been requested to do so then.

4.  The client, the supposed "victim" of the misappropriation, suffered no harm whatever. In fact, she was completely satisfied with Respondent's services, and did not dispute the fees owed him or the propriety of his withdrawals.

5.  The misconduct was limited to a single set of facts concerning a single client.

6.  Respondent has practiced law for 22 years without any disciplinary violations.

These circumstances persuade us that the extreme remedy of disbarment is inappropriate.

We also note in mitigation that the client was not the complainant in this case and, as noted above, expressed her concurrence in Respondent's withdrawals from the trust fund. The complaint was the defendant in the lawsuit that Respondent brought on Mrs. Jackson's behalf, in which suit the Respondent was ultimately successful. The suit resulted in having a promissory note voided, thereby saving Mrs. Jackson a substantial amount of money—all to the detriment of the complainant.

In July of 1985, the complainant complained to Bar Counsel that Respondent issued a worthless check almost three years earlier (September 11, 1982), drawn on his trustee account. The check was

---

1.  The subject funds were under some sort of "escrow" arrangement to facilitate payments under a disputed mortgage obligation while the enforceability of that obligation was being litigated. Thus, at the time of withdrawal, the opposing party in that litigation may have had a claim to those funds as strong as that of the client, although the latter was ultimately held entitled to the funds. While there are no cases construing the "funds of a client" requirement in DR 9–103(A), we are assuming for purposes of this opinion that a misappropriation took place nevertheless.

made good on October 7, 1982, less than a month after its issuance. In the course of its investigation, in which Respondent cooperated, Bar Counsel found that Respondent had withdrawn funds from the monies he was holding in trust and had applied those funds to overdue legal fees. As of the date of the hearing, Respondent's client continued to owe Respondent legal fees and did not wish to see Respondent injured by reason of his withdrawals from the trust account. Tr. 27–28.

Our colleagues on the Board suggest that our reliance on these mitigating factors is only an effort to probe the degree of "corruptness" of Respondent's intent with respect to the misappropriation. It is not. To fail to consider these factors in recommending a sanction would be tantamount to adopting the mechanistic *per se* approach that the Court expressly eschewed in *Buckley* and *Hines*. We are not parsing degrees of "misappropriation"; we are, rather, determining how severely this Respondent should be sanctioned for his misconduct.

In terms of the consistency of our recommended sanction with other disciplinary cases, we believe that Respondent's misappropriation is more comparable to that involved in *In re Cefaratti*, M–140–82 (D.C. June 28, 1983), than to the misappropriations in *In re Quimby*, 123 U.S.App.D.C. 273, 359 F.2d 257 (1966); *In re Burka*, 423 A.2d 181 (D.C.1980); and *In re Burton*, 472 A.2d 831 (D.C.1984), in which disbarment was ordered. *Cefarrati* involved the Respondent's unauthorized use of funds entrusted to him. Cefarrati's former client, a corporation, had provided $15,000 to secure payment of a pension to a former corporate employee. Cefarrati had limited authority to invest the funds. Nevertheless, he withdrew $5,000 from the account, considering the withdrawal a loan and repaying the money with interest. However, there was no documentation supporting the loan and no consent had been obtained from the client for the withdrawal. The Court adopted the Board's recommendation for a year and a day suspension.

In cases in which disbarment was ordered for misappropriation, there were circumstances present which distinguish them from this case. In *In re Quimby*, 123 U.S.App.D.C. 273, 359 F.2d 257 (1966), the attorney misappropriated funds from the trusts of two incompetent war veterans. The attorney had no colorable right to the funds, using them instead to ease financial stresses created when a personal investment became unsound. In *In re Burton*, 472 A.2d 831 (D.C.1984), two separate disciplinary proceedings, involving repeated misappropriation and deceit, resulted in disbarment. And in *In re Burka*, 423 A.2d 181 (D.C.1980), an attorney made 15 unauthorized withdrawals from the account of an adult ward, totalling $41,000 and had no explanation whatever for the misappropriation.

*In re Buckley, supra*, is the Court's most recent misappropriation case. The attorney there failed to disburse approximately $5,300 received in settlement of a personal injury claim, and used those funds for personal purposes. Two years later, only after a complaint was filed with Bar Counsel, the attorney made proper distribution of the funds. The Court ordered the attorney disbarred.

What distinguishes this case from *Buckley* and the other disbarment cases is that the Respondent here was owed the money he withdrew from the trust account. In none of the other cases did the attorney have any claim to the misappropriated funds. Here, had the fund withdrawals occurred at the times shown on Respondent's accounting to his client in March 1983, there would have been no misappropriation because the withdrawals (to pay overdue legal fees) would have been authorized by the client. Respondent's misconduct occurred because he took the money first, and got permission later. We do not view this as an insignificant lapse of judgment or inadvertence, but it causes us to pull back from recommending the ultimate sanction of disbarment.

In sum, based on the mitigating factors in this case—seen in the light of the cited precedents—we do not feel that this is a

situation where the "ordinary" misappropriation sanction should apply. We feel a suspension for a year and a day will satisfy the public policy objectives of the disciplinary system in a manner consistent with the Court's recent holdings.

   /s/ Charles R. Donnenfeld/Bec
     CHARLES R. DONNENFELD

June 30, 1988

Ms. KAISER, Ms. KEEP and Mr. COHEN join in this opinion.